## SMITH *v.* MARYLAND

No. 78–5374.   Argued March 28, 1979—Decided June 20, 1979

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, REHNQUIST, and STEVENS, JJ., joined. STEWART, J., *post*, p. 746, and MARSHALL, J., *post*, p. 748, filed dissenting opinions, in which BRENNAN, J., joined. POWELL, J., took no part in the consideration or decision of the case.

*Howard L. Cardin* argued the cause for petitioner. With him on the brief was *James J. Gitomer.*

*Stephen H. Sachs,* Attorney General of Maryland, argued the cause for respondent. With him on the brief were *George A. Nilson,* Deputy Attorney General, and *Deborah K. Handel* and *Stephen B. Caplis,* Assistant Attorneys General.

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

This case presents the question whether the installation and use of a pen register [1] constitutes a "search" within the meaning of the Fourth Amendment,[2] made applicable to the States through the Fourteenth Amendment. *Mapp* v. *Ohio,* 367 U. S. 643 (1961).

---

[1] "A pen register is a mechanical device that records the numbers dialed on a telephone by monitoring the electrical impulses caused when the dial on the telephone is released. It does not overhear oral communications and does not indicate whether calls are actually completed." *United States* v. *New York Tel. Co.,* 434 U. S. 159, 161 n. 1 (1977). A pen register is "usually installed at a central telephone facility [and] records on a paper tape all numbers dialed from [the] line" to which it is attached. *United States* v. *Giordano,* 416 U. S. 505, 549 n. 1 (1974) (opinion concurring in part and dissenting in part). See also *United States* v. *New York Tel. Co.,* 434 U. S., at 162.

[2] "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U. S. Const., Amdt. 4.

## I

On March 5, 1976, in Baltimore, Md., Patricia McDonough was robbed. She gave the police a description of the robber and of a 1975 Monte Carlo automobile she had observed near the scene of the crime. Tr. 66–68. After the robbery, McDonough began receiving threatening and obscene phone calls from a man identifying himself as the robber. On one occasion, the caller asked that she step out on her front porch; she did so, and saw the 1975 Monte Carlo she had earlier described to police moving slowly past her home. *Id.*, at 70. On March 16, police spotted a man who met McDonough's description driving a 1975 Monte Carlo in her neighborhood. *Id.*, at 71–72. By tracing the license plate number, police learned that the car was registered in the name of petitioner, Michael Lee Smith. *Id.*, at 72.

The next day, the telephone company, at police request, installed a pen register at its central offices to record the numbers dialed from the telephone at petitioner's home. *Id.*, at 73, 75. The police did not get a warrant or court order before having the pen register installed. The register revealed that on March 17 a call was placed from petitioner's home to McDonough's phone. *Id.*, at 74. On the basis of this and other evidence, the police obtained a warrant to search petitioner's residence. *Id.*, at 75. The search revealed that a page in petitioner's phone book was turned down to the name and number of Patricia McDonough; the phone book was seized. *Ibid.* Petitioner was arrested, and a six-man lineup was held on March 19. McDonough identified petitioner as the man who had robbed her. *Id.*, at 70–71.

Petitioner was indicted in the Criminal Court of Baltimore for robbery. By pretrial motion, he sought to suppress "all fruits derived from the pen register" on the ground that the police had failed to secure a warrant prior to its installation. Record 14; Tr. 54–56. The trial court denied the suppression motion, holding that the warrantless installation of the pen

register did not violate the Fourth Amendment. *Id.*, at 63. Petitioner then waived a jury, and the case was submitted to the court on an agreed statement of facts. *Id.*, at 65–66. The pen register tape (evidencing the fact that a phone call had been made from petitioner's phone to McDonough's phone) and the phone book seized in the search of petitioner's residence were admitted into evidence against him. *Id.*, at 74–76. Petitioner was convicted, *id.*, at 78, and was sentenced to six years. He appealed to the Maryland Court of Special Appeals, but the Court of Appeals of Maryland issued a writ of certiorari to the intermediate court in advance of its decision in order to consider whether the pen register evidence had been properly admitted at petitioner's trial. 283 Md. 156, 160, 389 A. 2d 858, 860 (1978).

The Court of Appeals affirmed the judgment of conviction, holding that "there is no constitutionally protected reasonable expectation of privacy in the numbers dialed into a telephone system and hence no search within the fourth amendment is implicated by the use of a pen register installed at the central offices of the telephone company." *Id.*, at 173, 389 A. 2d, at 867. Because there was no "search," the court concluded, no warrant was needed. Three judges dissented, expressing the view that individuals do have a legitimate expectation of privacy regarding the phone numbers they dial from their homes; that the installation of a pen register thus constitutes a "search"; and that, in the absence of exigent circumstances, the failure of police to secure a warrant mandated that the pen register evidence here be excluded. *Id.*, at 174, 178, 389 A. 2d, at 868, 870. Certiorari was granted in order to resolve indications of conflict in the decided cases as to the restrictions imposed by the Fourth Amendment on the use of pen registers.[3] 439 U. S. 1001 (1978).

---

[3] See *Application of United States for Order*, 546 F. 2d 243, 245 (CA8 1976), cert. denied *sub nom. Southwestern Bell Tel. Co.* v. *United States*, 434 U. S. 1008 (1978); *Application of United States in Matter of Order,*

## II

### A

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." In determining whether a particular form of government-initiated electronic surveillance is a "search" within the meaning of the Fourth Amendment,[4] our lodestar is *Katz* v. *United States,* 389 U. S. 347 (1967). In *Katz,* Government agents had intercepted the contents of a telephone conversation by attaching an electronic listening device to the outside of a public phone booth. The Court rejected the argument that a "search" can occur only when there has been a "physical intrusion" into a "constitutionally protected area," noting that the Fourth Amendment "protects people, not places." *Id.,* at 351–353. Because the Government's monitoring of Katz' conversation "violated the privacy upon which he justifiably relied while using the telephone booth," the Court held that

---

538 F. 2d 956, 959–960 (CA2 1976), rev'd on other grounds *sub nom. United States* v. *New York Tel. Co.,* 434 U. S. 159 (1977); *United States* v. *Falcone,* 505 F. 2d 478, 482, and n. 21 (CA3 1974), cert. denied, 420 U. S. 955 (1975); *Hodge* v. *Mountain States Tel. & Tel. Co.,* 555 F. 2d 254, 256 (CA9 1977); *id.,* at 266 (concurring opinion); and *United States* v. *Clegg,* 509 F. 2d 605, 610 (CA5 1975). In previous decisions, this Court has not found it necessary to consider whether "pen register surveillance [is] subject to the requirements of the Fourth Amendment." *United States* v. *New York Tel. Co.,* 434 U. S., at 165 n. 7. See *United States* v. *Giordano,* 416 U. S., at 554 n. 4 (opinion concurring in part and dissenting in part).

[4] In this case, the pen register was installed, and the numbers dialed were recorded, by the telephone company. Tr. 73–74. The telephone company, however, acted at police request. *Id.,* at 73, 75. In view of this, respondent appears to concede that the company is to be deemed an "agent" of the police for purposes of this case, so as to render the installation and use of the pen register "state action" under the Fourth and Fourteenth Amendments. We may assume that "state action" was present here.

it "constituted a 'search and seizure' within the meaning of the Fourth Amendment." *Id.,* at 353.

Consistently with *Katz,* this Court uniformly has held that the application of the Fourth Amendment depends on whether the person invoking its protection can claim a "justifiable," a "reasonable," or a "legitimate expectation of privacy" that has been invaded by government action. *E. g., Rakas* v. *Illinois,* 439 U. S. 128, 143, and n. 12 (1978); *id.,* at 150, 151 (concurring opinion); *id.,* at 164 (dissenting opinion); *United States* v. *Chadwick,* 433 U. S. 1, 7 (1977); *United States* v. *Miller,* 425 U. S. 435, 442 (1976); *United States* v. *Dionisio,* 410 U. S. 1, 14 (1973); *Couch* v. *United States,* 409 U. S. 322, 335–336 (1973); *United States* v. *White,* 401 U. S. 745, 752 (1971) (plurality opinion); *Mancusi* v. *DeForte,* 392 U. S. 364, 368 (1968); *Terry* v. *Ohio,* 392 U. S. 1, 9 (1968). This inquiry, as Mr. Justice Harlan aptly noted in his *Katz* concurrence, normally embraces two discrete questions. The first is whether the individual, by his conduct, has "exhibited an actual (subjective) expectation of privacy," 389 U. S., at 361—whether, in the words of the *Katz* majority, the individual has shown that "he seeks to preserve [something] as private." *Id.,* at 351. The second question is whether the individual's subjective expectation of privacy is "one that society is prepared to recognize as 'reasonable,' " *id.,* at 361— whether, in the words of the *Katz* majority, the individual's expectation, viewed objectively, is "justifiable" under the circumstances. *Id.,* at 353.[5] See *Rakas* v. *Illinois,* 439 U. S.,

[5] Situations can be imagined, of course, in which *Katz'* two-pronged inquiry would provide an inadequate index of Fourth Amendment protection. For example, if the Government were suddenly to announce on nationwide television that all homes henceforth would be subject to warrantless entry, individuals thereafter might not in fact entertain any actual expectation of privacy regarding their homes, papers, and effects. Similarly, if a refugee from a totalitarian country, unaware of this Nation's traditions, erroneously assumed that police were continuously monitoring his telephone conversations, a subjective expectation of privacy regarding

at 143–144, n. 12; *id.,* at 151 (concurring opinion); *United States* v. *White,* 401 U. S., at 752 (plurality opinion).

## B

In applying the *Katz* analysis to this case, it is important to begin by specifying precisely the nature of the state activity that is challenged. The activity here took the form of installing and using a pen register. Since the pen register was installed on telephone company property at the telephone company's central offices, petitioner obviously cannot claim that his "property'" was invaded or that police intruded into a "constitutionally protected area." Petitioner's claim, rather, is that, notwithstanding the absence of a trespass, the State, as did the Government in *Katz,* infringed a "legitimate expectation of privacy" that petitioner held. Yet a pen register differs significantly from the listening device employed in *Katz,* for pen registers do not acquire the *contents* of communications. This Court recently noted:

"Indeed, a law enforcement official could not even determine from the use of a pen register whether a communication existed. These devices do not hear sound. They disclose only the telephone numbers that have been dialed—a means of establishing communication. Neither the purport of any communication between the caller and the recipient of the call, their identities, nor whether the call was even completed is disclosed by pen registers." *United States* v. *New York Tel. Co.,* 434 U. S. 159, 167 (1977).

the contents of his calls might be lacking as well. In such circumstances, where an individual's subjective expectations had been "conditioned" by influences alien to well-recognized Fourth Amendment freedoms, those subjective expectations obviously could play no meaningful role in ascertaining what the scope of Fourth Amendment protection was. In determining whether a "legitimate expectation of privacy" existed in such cases, a normative inquiry would be proper.

Given a pen register's limited capabilities, therefore, petitioner's argument that its installation and use constituted a "search" necessarily rests upon a claim that he had a "legitimate expectation of privacy" regarding the numbers he dialed on his phone.

This claim must be rejected. First, we doubt that people in general entertain any actual expectation of privacy in the numbers they dial. All telephone users realize that they must "convey" phone numbers to the telephone company, since it is through telephone company switching equipment that their calls are completed. All subscribers realize, moreover, that the phone company has facilities for making permanent records of the numbers they dial, for they see a list of their long-distance (toll) calls on their monthly bills. In fact, pen registers and similar devices are routinely used by telephone companies "for the purposes of checking billing operations, detecting fraud, and preventing violations of law." *United States* v. *New York Tel. Co.,* 434 U. S., at 174–175. Electronic equipment is used not only to keep billing records of toll calls, but also "to keep a record of all calls dialed from a telephone which is subject to a special rate structure." *Hodge* v. *Mountain States Tel. & Tel. Co.,* 555 F. 2d 254, 266 (CA9 1977) (concurring opinion). Pen registers are regularly employed "to determine whether a home phone is being used to conduct a business, to check for a defective dial, or to check for overbilling." Note, The Legal Constraints upon the Use of the Pen Register as a Law Enforcement Tool, 60 Cornell L. Rev. 1028, 1029 (1975) (footnotes omitted). Although most people may be oblivious to a pen register's esoteric functions, they presumably have some awareness of one common use: to aid in the identification of persons making annoying or obscene calls. See, *e. g., Von Lusch* v. *C & P Telephone Co.,* 457 F. Supp. 814, 816 (Md. 1978); Note, 60 Cornell L. Rev., at 1029–1030, n. 11; Claerhout, The Pen Register, 20 Drake L. Rev. 108, 110–111 (1970). Most phone books tell

subscribers, on a page entitled "Consumer Information," that the company "can frequently help in identifying to the authorities the origin of unwelcome and troublesome calls." *E. g.,* Baltimore Telephone Directory 21 (1978); District of Columbia Telephone Directory 13 (1978). Telephone users, in sum, typically know that they must convey numerical information to the phone company; that the phone company has facilities for recording this information; and that the phone company does in fact record this information for a variety of legitimate business purposes. Although subjective expectations cannot be scientifically gauged, it is too much to believe that telephone subscribers, under these circumstances, harbor any general expectation that the numbers they dial will remain secret.

Petitioner argues, however, that, whatever the expectations of telephone users in general, he demonstrated an expectation of privacy by his own conduct here, since he "us[ed] the telephone *in his house* to the exclusion of all others." Brief for Petitioner 6 (emphasis added). But the site of the call is immaterial for purposes of analysis in this case. Although petitioner's conduct may have been calculated to keep the *contents* of his conversation private, his conduct was not and could not have been calculated to preserve the privacy of the number he dialed. Regardless of his location, petitioner had to convey that number to the telephone company in precisely the same way if he wished to complete his call. The fact that he dialed the number on his home phone rather than on some other phone could make no conceivable difference, nor could any subscriber rationally think that it would.

Second, even if petitioner did harbor some subjective expectation that the phone numbers he dialed would remain private, this expectation is not "one that society is prepared to recognize as 'reasonable.'" *Katz* v. *United States,* 389 U. S., at 361. This Court consistently has held that a person has no legitimate expectation of privacy in information he

voluntarily turns over to third parties. *E. g., United States* v. *Miller,* 425 U. S., at 442–444; *Couch* v. *United States,* 409 U. S., at 335–336; *United States* v. *White,* 401 U. S., at 752 (plurality opinion); *Hoffa* v. *United States,* 385 U. S. 293, 302 (1966); *Lopez* v. *United States,* 373 U. S. 427 (1963). In *Miller,* for example, the Court held that a bank depositor has no "legitimate 'expectation of privacy' " in financial information "voluntarily conveyed to . . . banks and exposed to their employees in the ordinary course of business." 425 U. S., at 442. The Court explained:

"The depositor takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government. . . . This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed." *Id.,* at 443.

Because the depositor "assumed the risk" of disclosure, the Court held that it would be unreasonable for him to expect his financial records to remain private.

This analysis dictates that petitioner can claim no legitimate expectation of privacy here. When he used his phone, petitioner voluntarily conveyed numerical information to the telephone company and "exposed" that information to its equipment in the ordinary course of business. In so doing, petitioner assumed the risk that the company would reveal to police the numbers he dialed. The switching equipment that processed those numbers is merely the modern counterpart of the operator who, in an earlier day, personally completed calls for the subscriber. Petitioner concedes that if he had placed his calls through an operator, he could claim no legitimate expectation of privacy. Tr. of Oral Arg. 3–5, 11–12, 32. We

are not inclined to hold that a different constitutional result is required because the telephone company has decided to automate.

Petitioner argues, however, that automatic switching equipment differs from a live operator in one pertinent respect. An operator, in theory at least, is capable of remembering every number that is conveyed to him by callers. Electronic equipment, by contrast, can "remember" only those numbers it is programmed to record, and telephone companies, in view of their present billing practices, usually do not record local calls. Since petitioner, in calling McDonough, was making a local call, his expectation of privacy as to her number, on this theory, would be "legitimate."

This argument does not withstand scrutiny. The fortuity of whether or not the phone company in fact elects to make a quasi-permanent record of a particular number dialed does not, in our view, make any constitutional difference. Regardless of the phone company's election, petitioner voluntarily conveyed to it information that it had facilities for recording and that it was free to record. In these circumstances, petitioner assumed the risk that the information would be divulged to police. Under petitioner's theory, Fourth Amendment protection would exist, or not, depending on how the telephone company chose to define local-dialing zones, and depending on how it chose to bill its customers for local calls. Calls placed across town, or dialed directly, would be protected; calls placed across the river, or dialed with operator assistance, might not be. We are not inclined to make a crazy quilt of the Fourth Amendment, especially in circumstances where (as here) the pattern of protection would be dictated by billing practices of a private corporation.

We therefore conclude that petitioner in all probability entertained no actual expectation of privacy in the phone numbers he dialed, and that, even if he did, his expectation was not "legitimate." The installation and use of a pen reg-

ister, consequently, was not a "search," and no warrant was required. The judgment of the Maryland Court of Appeals is affirmed.

*It is so ordered.*

Mr. Justice Powell took no part in the consideration or decision of this case.

Mr. Justice Stewart, with whom Mr. Justice Brennan joins, dissenting.

I am not persuaded that the numbers dialed from a private telephone fall outside the constitutional protection of the Fourth and Fourteenth Amendments.

In *Katz* v. *United States,* 389 U. S. 347, 352, the Court acknowledged the "vital role that the public telephone has come to play in private communication[s]." The role played by a private telephone is even more vital, and since *Katz* it has been abundantly clear that telephone conversations carried on by people in their homes or offices are fully protected by the Fourth and Fourteenth Amendments. As the Court said in *United States* v. *United States District Court,* 407 U. S. 297, 313, "the broad and unsuspected governmental incursions into conversational privacy which electronic surveillance entails necessitate the application of Fourth Amendment safeguards." (Footnote omitted.)

Nevertheless, the Court today says that those safeguards do not extend to the numbers dialed from a private telephone, apparently because when a caller dials a number the digits may be recorded by the telephone company for billing purposes. But that observation no more than describes the basic nature of telephone calls. A telephone call simply cannot be made without the use of telephone company property and without payment to the company for the service. The telephone conversation itself must be electronically transmitted by telephone company equipment, and may be recorded or overheard by the use of other company equipment. Yet we

have squarely held that the user of even a public telephone is entitled "to assume that the words he utters into the mouthpiece will not be broadcast to the world." *Katz* v. *United States, supra,* at 352.

The central question in this case is whether a person who makes telephone calls from his home is entitled to make a similar assumption about the numbers he dials. What the telephone company does or might do with those numbers is no more relevant to this inquiry than it would be in a case involving the conversation itself. It is simply not enough to say, after *Katz*, that there is no legitimate expectation of privacy in the numbers dialed because the caller assumes the risk that the telephone company will disclose them to the police.

I think that the numbers dialed from a private telephone—like the conversations that occur during a call—are within the constitutional protection recognized in *Katz*.[1] It seems clear to me that information obtained by pen register surveillance of a private telephone is information in which the telephone subscriber has a legitimate expectation of privacy.[2] The information captured by such surveillance emanates from private conduct within a person's home or office—locations that without question are entitled to Fourth and Fourteenth Amendment protection. Further, that information is an integral part of the telephonic communication that under *Katz*

---

[1] It is true, as the Court pointed out in *United States* v. *New York Tel. Co.*, 434 U. S. 159, 166–167, that under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U. S. C. §§ 2510–2520, pen registers are not considered "interceptions" because "they do not acquire the 'contents' of communications," as that term is defined by Congress. We are concerned in this case, however, not with the technical definitions of a statute, but with the requirements of the Constitution.

[2] The question whether a defendant who is not a member of the subscriber's household has "standing" to object to pen register surveillance of a private telephone is, of course, distinct. Cf. *Rakas* v. *Illinois*, 439 U. S. 128.

is entitled to constitutional protection, whether or not it is captured by a trespass into such an area.

The numbers dialed from a private telephone—although certainly more prosaic than the conversation itself—are not without "content." Most private telephone subscribers may have their own numbers listed in a publicly distributed directory, but I doubt there are any who would be happy to have broadcast to the world a list of the local or long distance numbers they have called. This is not because such a list might in some sense be incriminating, but because it easily could reveal the identities of the persons and the places called, and thus reveal the most intimate details of a person's life.

I respectfully dissent.

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN joins, dissenting.

The Court concludes that because individuals have no actual or legitimate expectation of privacy in information they voluntarily relinquish to telephone companies, the use of pen registers by government agents is immune from Fourth Amendment scrutiny. Since I remain convinced that constitutional protections are not abrogated whenever a person apprises another of facts valuable in criminal investigations, see, *e. g., United States* v. *White,* 401 U. S. 745, 786–790 (1971) (Harlan, J., dissenting); *id.,* at 795–796 (MARSHALL, J., dissenting); *California Bankers Assn.* v. *Shultz,* 416 U. S. 21, 95–96 (1974) (MARSHALL, J., dissenting); *United States* v. *Miller,* 425 U. S. 435, 455–456 (1976) (MARSHALL, J., dissenting), I respectfully dissent.

Applying the standards set forth in *Katz* v. *United States,* 389 U. S. 347, 361 (1967) (Harlan, J., concurring), the Court first determines that telephone subscribers have no subjective expectations of privacy concerning the numbers they dial. To reach this conclusion, the Court posits that individuals somehow infer from the long-distance listings on their phone bills, and from the cryptic assurances of "help" in tracing obscene

calls included in "most" phone books, that pen registers are regularly used for recording local calls. See *ante,* at 742–743. But even assuming, as I do not, that individuals "typically know" that a phone company monitors calls for internal reasons, *ante,* at 743,[1] it does not follow that they expect this information to be made available to the public in general or the government in particular. Privacy is not a discrete commodity, possessed absolutely or not at all. Those who disclose certain facts to a bank or phone company for a limited business purpose need not assume that this information will be released to other persons for other purposes. See *California Bankers Assn.* v. *Shultz, supra,* at 95–96 (MARSHALL, J., dissenting).

The crux of the Court's holding, however, is that whatever expectation of privacy petitioner may in fact have entertained regarding his calls, it is not one "society is prepared to recognize as 'reasonable.'" *Ante,* at 743. In so ruling, the Court determines that individuals who convey information to third parties have "assumed the risk" of disclosure to the government. *Ante,* at 744, 745. This analysis is misconceived in two critical respects.

Implicit in the concept of assumption of risk is some notion of choice. At least in the third-party consensual surveillance cases, which first incorporated risk analysis into Fourth Amendment doctrine, the defendant presumably had exercised some discretion in deciding who should enjoy his confidential communications. See, *e. g., Lopez* v. *United States,* 373 U. S. 427, 439 (1963); *Hoffa* v. *United States,* 385 U. S. 293, 302–303 (1966); *United States* v. *White, supra,* at 751–752

---

[1] Lacking the Court's apparently exhaustive knowledge of this Nation's telephone books and the reading habits of telephone subscribers, see *ante,* at 742–743, I decline to assume general public awareness of how obscene phone calls are traced. Nor am I persuaded that the scope of Fourth Amendment protection should turn on the concededly "esoteric functions" of pen registers in corporate billing, *ante,* at 742, functions with which subscribers are unlikely to have intimate familiarity.

(plurality opinion). By contrast here, unless a person is prepared to forgo use of what for many has become a personal or professional necessity, he cannot help but accept the risk of surveillance. Cf. *Lopez* v. *United States, supra,* at 465–466 (BRENNAN, J., dissenting). It is idle to speak of "assuming" risks in contexts where, as a practical matter, individuals have no realistic alternative.

More fundamentally, to make risk analysis dispositive in assessing the reasonableness of privacy expectations would allow the government to define the scope of Fourth Amendment protections. For example, law enforcement officials, simply by announcing their intent to monitor the content of random samples of first-class mail or private phone conversations, could put the public on notice of the risks they would thereafter assume in such communications. See Amsterdam, Perspectives on the Fourth Amendment, 58 Minn. L. Rev. 349, 384, 407 (1974). Yet, although acknowledging this implication of its analysis, the Court is willing to concede only that, in some circumstances, a further "normative inquiry would be proper." *Ante,* at 740–741, n. 5. No meaningful effort is made to explain what those circumstances might be, or why this case is not among them.

In my view, whether privacy expectations are legitimate within the meaning of *Katz* depends not on the risks an individual can be presumed to accept when imparting information to third parties, but on the risks he should be forced to assume in a free and open society. By its terms, the constitutional prohibition of unreasonable searches and seizures assigns to the judiciary some prescriptive responsibility. As Mr. Justice Harlan, who formulated the standard the Court applies today, himself recognized: "[s]ince it is the task of the law to form and project, as well as mirror and reflect, we should not . . . merely recite . . . risks without examining the desirability of saddling them upon society." *United States* v. *White, supra,* at 786 (dissenting opinion). In making this

assessment, courts must evaluate the "intrinsic character" of investigative practices with reference to the basic values underlying the Fourth Amendment. *California Bankers Assn.* v. *Shultz,* 416 U. S., at 95 (MARSHALL, J., dissenting). And for those "extensive intrusions that significantly jeopardize [individuals'] sense of security . . . , more than self-restraint by law enforcement officials is required." *United States* v. *White,* 401 U. S., at 786 (Harlan, J., dissenting).

The use of pen registers, I believe, constitutes such an extensive intrusion. To hold otherwise ignores the vital role telephonic communication plays in our personal and professional relationships, see *Katz* v. *United States,* 389 U. S., at 352, as well as the First and Fourth Amendment interests implicated by unfettered official surveillance. Privacy in placing calls is of value not only to those engaged in criminal activity. The prospect of unregulated governmental monitoring will undoubtedly prove disturbing even to those with nothing illicit to hide. Many individuals, including members of unpopular political organizations or journalists with confidential sources, may legitimately wish to avoid disclosure of their personal contacts. See *NAACP* v. *Alabama,* 357 U. S. 449, 463 (1958); *Branzburg* v. *Hayes,* 408 U. S. 665, 695 (1972); *id.,* at 728–734 (STEWART, J., dissenting). Permitting governmental access to telephone records on less than probable cause may thus impede certain forms of political affiliation and journalistic endeavor that are the hallmark of a truly free society. Particularly given the Government's previous reliance on warrantless telephonic surveillance to trace reporters' sources and monitor protected political activity,[2] I am unwilling to insulate use of pen registers from independent judicial review.

---

[2] See, *e. g., Reporters Committee For Freedom of Press* v. *American Tel. & Tel. Co.,* 192 U. S. App. D. C. 376, 593 F. 2d 1030 (1978), cert. denied, 440 U. S. 949 (1979); *Halperin* v. *Kissinger,* 434 F. Supp. 1193 (DC 1977); *Socialist Workers Party* v. *Attorney General,* 463 F. Supp. 515 (SDNY 1978).

Just as one who enters a public telephone booth is "entitled to assume that the words he utters into the mouthpiece will not be broadcast to the world," *Katz* v. *United States, supra,* at 352, so too, he should be entitled to assume that the numbers he dials in the privacy of his home will be recorded, if at all, solely for the phone company's business purposes. Accordingly, I would require law enforcement officials to obtain a warrant before they enlist telephone companies to secure information otherwise beyond the government's reach.