David WESTFALL, Appellant,

v.

The STATE of Texas, Appellee.

No. 10–97–180–CR.

Court of Appeals of Texas,
Waco.

Dec. 15, 1999.

Patrick A. Robertson, Edgar A. Mason, Dallas, appellant.

Joe F. Grubbs, County & Dist. Atty., C. Denean Avery, Asst. County & Dist. Atty., Waxahachie, for appellee.

Before Chief Justice DAVIS Justice VANCE and Justice GRAY.

## O P I N I O N

REX D. DAVIS, Chief Justice.

A jury convicted David Westfall of cruelty to animals. *See* TEX. PEN.CODE ANN. § 42.09(a)(2) (Vernon Supp.2000). The jury assessed a $4,000 fine as punishment for the offense. Westfall claims in five points of error that the court erred by: (1) holding that he lacks standing to challenge "any of the searches and seizures of his property"; (2) permitting an improper amendment of the information; (3) overruling his request for production of a deputy's written report prior to his cross-examination of the deputy; (4) refusing to admit documents he offered under the business records exception to the hearsay rule; and (5) failing to submit an accomplice-witness instruction in the charge.

## BACKGROUND

Westfall hired Tony Gist as his ranch manager in 1988. Westfall formed the G. David Westfall Family Limited Partnership dba Westfall Family Farms in 1990. Westfall is both a general and limited partner of the partnership. During the pertinent time period, the partnership owned or leased several tracts of land in Ellis and Navarro Counties on which it kept approximately 300 head of cattle and two donkeys. As ranch manager, Gist had the primary responsibility to feed and care for the animals.

From late 1995 through May 1996, a severe drought persisted in Ellis County and throughout the northern part of Texas. Because of the drought, the grass on the partnership's property was too sparse to provide adequate nutrition for the cattle. Gist testified that he asked Westfall as early as September 1995 to order hay to feed the herd. From December 1995 through March 1996, Westfall purchased alfalfa hay and other protein-rich food sources to supplement the cattle's diet.

In March 1996, Ellis County Deputy Sheriff Tommy Parks began an investigation of the condition of the cattle. Parks went on the property without Westfall's permission or knowledge and saw evidence that the cattle were malnourished. Parks summoned the Society for the Prevention of Cruelty to Animals (the "SPCA") and the Humane Society to assist him in assessing the situation. Parks and others went on the premises repeatedly during March and April as the investigation continued.

On April 30, Parks presented an application to an Ellis County justice of the peace for a warrant to seize the cattle and donkeys. *See* TEX. HEALTH & SAFETY CODE ANN. § 821.022(a) (Vernon 1992). The justice granted the application that same date and set a hearing on the matter for May 9. *Id.* § 821.022(b) (Vernon 1992). After the hearing, the justice determined that the animals seized had been cruelly treated and ordered that the animals be given to the SPCA. *Id.* § 821.023(e) (Vernon Supp. 2000).

## WARRANTLESS SEARCHES

Westfall contends in his first point that the court erred in ruling that he lacks standing to challenge the warrantless entries by Deputy Parks and others on the partnership's property, the taking of photographs by Parks and others while on the property, and any other fruits flowing from these entries. Westfall challenges these entries under both state and federal constitutional prohibitions against unreasonable search and seizure. *See* U.S. CONST. amend. IV; TEX. CONST. art. I, § 9. Because article I, section 9 of the Texas Constitution "does not offer greater protection to the individual than the Fourth Amendment," we will address Westfall's state and federal claims togeth-

er. *Hulit v. State,* 982 S.W.2d 431, 436 (Tex.Crim.App.1998).

■ At the suppression hearing, the parties stipulated that the partnership owned the cattle and owned or leased the four tracts of property on which the partnership kept its cattle.[1] If the pertinent evidence is not in dispute, an appellate court "may review *de novo* 'mixed questions of law and fact' " when the resolution of those issues does not turn on an evaluation of credibility and demeanor. *Guzman v. State,* 955 S.W.2d 85, 89 (Tex.Crim.App. 1997). We will affirm the decision if correct on any theory of law applicable to the case. *Hunter v. State,* 955 S.W.2d 102, 107 (Tex.Crim.App.1997); *Romero v. State,* 800 S.W.2d 539, 543 (Tex.Crim.App.1990).

■ We assume without deciding that a general partner such as Westfall has standing to complain of a warrantless search of property belonging to a limited partnership. *See Northwest Otolaryngology Assocs. v. Mobilease, Inc.,* 786 S.W.2d 399, 404 (Tex.App.—Texarkana 1990, writ denied) ("A limited partnership acts only through its general partner"). We note that commercial premises enjoy the protections of the Fourth Amendment and article I, section 9 although to a lesser degree than those protections extend to persons and residences. *New York v. Burger,* 482 U.S. 691, 699–700, 107 S.Ct. 2636, 2642, 96 L.Ed.2d 601 (1987); *Crosby v. State,* 750 S.W.2d 768, 774–75 (Tex. Crim.App.1987). Nevertheless, we conclude that the trial court correctly denied the suppression motion.

■ A person establishes standing to contest an illegal search under the Fourth Amendment and article I, section 9 by demonstrating a reasonable expectation of privacy in the area searched. *Villarreal v. State,* 935 S.W.2d 134, 138 (Tex.Crim.App. 1996). The test for determining whether a person has demonstrated a reasonable expectation of privacy has two components:

(1) whether the conduct of the person exhibits "an actual (subjective) expectation of privacy[;]" and if so,

(2) whether the expectation is "one that society is prepared to recognize as 'reasonable[.]' "

*Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979) (quoting *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring)); *Villarreal,* 935 S.W.2d at 138.

■ The protections of the Fourth Amendment and article I, section 9 do not extend to "open fields." *Oliver v. United States,* 466 U.S. 170, 179, 104 S.Ct. 1735, 1741–42, 80 L.Ed.2d 214 (1984); *Leal v. State,* 736 S.W.2d 907, 909–10 (Tex.App.— Corpus Christi 1987), *pet. dism'd, improvidently granted,* 773 S.W.2d 296 (Tex.Crim. App.1989); *Beasley v. State,* 683 S.W.2d 132, 135 (Tex.App.—Eastland 1985, pet. ref'd) (op. on reh'g) (latter two applying open fields doctrine under art. I, § 9). An "asserted expectation of privacy in open fields is not an expectation that 'society recognizes as reasonable.' " *Oliver,* 466 U.S. at 179, 104 S.Ct. at 1741–42.

■ "An 'open field' need not be 'open' or a 'field' as those terms are commonly used; a fenced, thickly wooded area may be an open field for purposes of fourth amendment analysis." *Rosalez v. State,* 875 S.W.2d 705, 714 (Tex.App.—Dallas 1993, pet. ref'd) (citing *Oliver,* 466 U.S. at 180 n. 11, 104 S.Ct. at 1742 n. 11). The

---

1. Near the end of trial, Westfall tried to introduce a certified copy of a three-year lease he had executed in 1987 in his own behalf for one of the four tracts on which the partnership kept the cattle. He argued that this original lease had been renewed and was still in force in 1995 on a month-to-month basis. The court sustained the State's objection to this document, and Westfall does not challenge this ruling. Thus, we limit our review of the court's ruling on the suppression motion to the evidence and stipulations offered in that hearing. *See Rachal v. State,* 917 S.W.2d 799, 809 (Tex.Crim.App.1996) (appellate court can consider trial evidence when reviewing suppression ruling if "the suppression issue has been consensually re-litigated by the parties during trial").

Dallas Court has determined that a "building and [a] small barn" located in an "open field" are not entitled to Fourth Amendment protection. *Rosalez*, 875 S.W.2d at 713–14; *but cf. United States v. Dunn*, 480 U.S. 294, 303–04, 107 S.Ct. 1134, 1141, 94 L.Ed.2d 326 (1987) (leaving open the question of whether a barn located outside the curtilage of a residence is protected by the Fourth Amendment).

■ Westfall resides in Dallas. He does not maintain a residence on the partnership property. The fenced fields on which the partnership kept its cattle clearly constitute open fields. *See Oliver*, 466 U.S. at 182, 104 S.Ct. at 1743. Thus, the partnership has no reasonable expectation of privacy in these areas. *Id.* at 179, 104 S.Ct. at 1741–42.

■ Like the buildings in *Rosalez*, the partnership's barn is not located adjacent to a residence and cannot be said "to have been used for or associated with 'intimate activities of the home.'" *Rosalez*, 875 S.W.2d at 713 (quoting *Dunn*, 480 U.S. at 302, 107 S.Ct. at 1140). To the extent commercial activities were conducted in the barn, Westfall offered no evidence of any subjective expectation of privacy therein. *See State v. Klima*, 934 S.W.2d 109, 110 (Tex.Crim.App.1996) ("defendant bears the burden of proving that he had a legitimate expectation of privacy in the premises searched").[2] Thus, we conclude the partnership has no reasonable expectation of privacy in the barn. *Rosalez*, 875 S.W.2d at 714.

Because the partnership has no reasonable expectation of privacy in the fields and barn, it (and its general partner) lacks standing to complain of the warrantless search of these areas. *Villarreal*, 935

S.W.2d at 139. Accordingly, we overrule Westfall's first point.

## AMENDMENT OF INFORMATION

■ Westfall argues in his second point that the court erred by permitting the State to file a new information in substitution for the original after granting the State's motion to amend the original and by charging the jury on the basis of the "amended" information.

The original information alleges in pertinent part:

that on or about the 25th day of March, 1996, and before the making and filing of this information, in the County of Ellis and the State of Texas, one GWENN DAVID WESTFALL did then and there intentionally and knowingly torture LIVESTOCK by FAILING TO PROVIDE FEED OR SUPPLY CARE FOR HIS LIVESTOCK CAUSING THEM TO STARVE AND DIE.

Almost nine months after filing the information, the State filed a motion requesting that the court amend the information by deleting the portion following "intentionally and knowingly" and substituting the following: "failed unreasonably to provide necessary food and care for a donkey and bovine livestock in the defendant's custody, by failing to provide sufficient food and/or medical care for said animals." Over Westfall's objection, the court entered an order granting the State's motion. The court did not interlineate the substituted language on the face of the information. Rather, the State filed a new complaint and information under the original cause number reflecting the substituted language.

Article 28.10 of the Code of Criminal Procedure delineates the procedures for

---

**2.** Westfall testified in essence at the suppression hearing only that he gave no one permission to come on the property. He did not describe the barn or present other evidence demonstrating any greater expectation of privacy in the barn than in the fields surrounding it. In addition, photographs in the record

reflect that the barn is a fairly open structure the interior of which can be viewed from outside. *See, e.g., Jones v. State*, 949 S.W.2d 509, 516 (Tex.App.—Fort Worth 1997, no pet.) (seizure of evidence inside mobile home plainly visible from outside not unreasonable).

amending an indictment or information. *See* Tex.Code Crim. Proc. Ann. art. 28.10 (Vernon 1989). The Court of Criminal Appeals has determined that an indictment is "amended" for purposes of article 28.10 when there is an "actual alteration of the charging instrument." *Ward v. State,* 829 S.W.2d 787, 793 (Tex.Crim.App.1992). On the same date, the Court applied the same rule to the amendment of an information. *Rent v. State,* 838 S.W.2d 548, 551 (Tex. Crim.App.1992) (op. on reh'g).

In Westfall's case, the original information was never altered. Thus, it was never amended. *Ward,* 829 S.W.2d at 794–95. Accordingly, the court erred by charging the jury on the basis of the purportedly "amended" information.

▆▆▆ Such an error constitutes non-constitutional error and is subject to the harm analysis of appellate rule 44.2(b). *See Westfall v. State,* 970 S.W.2d 590, 596 (Tex. App.—Waco 1998, pet. ref'd);[3] Tex.R.App. P. 44.2(b). In *Westfall I,* we determined that the trial court had improperly permitted an amendment of the information after jeopardy had attached. *Westfall I,* 970 S.W.2d at 593. We concluded that the error was harmless however because the evidence was legally and factually sufficient to support Westfall's conviction under the original information. *Id.* at 595–96; *see also Ward,* 829 S.W.2d at 795 (remanding with order of acquittal because evidence insufficient to support conviction under original indictment).

As in *Westfall I,* we will review the legal and factual sufficiency of the evidence to see if it supports Westfall's conviction under the original information. If it does, we will conclude the State's failed attempt to amend the information is harmless. *See Westfall I,* 970 S.W.2d at 596.

In deciding a legal sufficiency question, we view the evidence in a light most favorable to the verdict and determine whether

any rational trier of fact could have found the essential elements beyond a reasonable doubt. *Mosley v. State,* 983 S.W.2d 249, 254 (Tex.Crim.App.1998) (op. on reh'g), *cert. denied,* —— U.S. ——, 119 S.Ct. 1466, 143 L.Ed.2d 550 (1999) (citing *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). We leave reconciliation of conflicts in the evidence to the jury and defer to it on such matters. *See id.*

When we review the factual sufficiency of the evidence, we discard the prism of the light most favorable to the verdict. *Clewis v. State,* 922 S.W.2d 126, 134 (Tex. Crim.App.1996). We reverse "only if [the verdict] is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Id.*

We consider all the evidence in the record related to the contested issue, "not just the evidence which supports the verdict." *Santellan v. State,* 939 S.W.2d 155, 164 (Tex.Crim.App.1997). We review the evidence tending to prove the issue, "and compare[ ] it to the evidence which tends to disprove that [issue]." *Id.* We give appropriate deference to the jury's decision and do not substitute our judgment for theirs. *Cain v. State,* 958 S.W.2d 404, 407 (Tex.Crim.App.1997). We do not set aside the "verdict merely because [we] feel that a different result is more reasonable." *Clewis,* 922 S.W.2d at 135 (quoting *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 634 (Tex. 1986)); *accord Cain,* 958 S.W.2d at 407.

▆▆▆ We measure the sufficiency of the evidence against a "hypothetically correct jury charge." *Malik v. State,* 953 S.W.2d 234, 240 (Tex.Crim.App.1997). Such a charge:

- accurately states the law;
- is authorized by the information;
- does not unnecessarily increase the State's burden of proof or unnecessari-

---

3. *Westfall v. State,* 970 S.W.2d 590 (Tex. App.—Waco 1998, pet. ref'd), is this Court's disposition of Westfall's appeal from a similar conviction in Navarro county. To avoid confusion, we refer to it hereinafter as *"Westfall I."*

ly restrict the State's theories of liability; and

- adequately describes the offense for which the defendant was tried.

*Id.*

 Reading the original information together with section 42.09 of the Penal Code, we find that a hypothetically correct charge would have required the jury to find that Westfall intentionally or knowingly tortured the cattle by failing unreasonably to provide necessary food or care for the cattle, causing them to starve or die.[4]

The following evidence tends to support the jury's verdict as against the hypothetically correct charge:

- Westfall testified that he has thirty years' experience in the cattle business;

- he exercised management responsibilities over the herd;

- he consciously decided on a management strategy for the herd in the Fall of 1995 in consultation with Gist, bearing in mind forecasts of a coming drought, and he continued to evaluate herd management decisions throughout the pertinent time period;

- he visited the property at least ten times from December 1995 through April 1996;

- Gist, veterinarian Victor Sancho, investigators with the SPCA and the Humane Society, and Deputy Parks all characterized the cattle as "emaciated" or "poor";

- Dr. Sancho explained that the emaciation he observed in the cattle had developed over several months and was not of recent onset;

- Sancho opined that the herd was "grossly mismanaged" because it did not receive adequate food;

- the SPCA investigator testified that the cattle were not fed or cared for properly;

- Gist felt that the cattle "suffered unnecessarily" because of inadequate food;

- he testified that he called Westfall or his wife Chris on numerous occasions requesting more food;

- Chris stated that she relayed all of Gist's messages to Westfall;

- according to Gist and others, several of the cows became bogged down in mud near a creek and remained stuck there until death because of their emaciation;

- Sancho testified that emaciated cows are not strong enough to extract themselves from the mud in this situation;

- Westfall's records demonstrate that he purchased no food supplement for the herd from March 26 through their seizure on May 3;

- Sancho testified that the weaker cows should have been segregated from the stronger for grazing and the older calves should have been weaned; and

- Westfall explained that he consciously decided to graze the whole herd together rather than separating out the weaker cows because he wanted all the cows to have access to grass across the creek.

From this evidence, we conclude a rational trier of fact could have found the essential elements as set forth in a hypothetically correct charge beyond a reasonable doubt. *See Malik,* 953 S.W.2d at 240. Thus, the evidence is legally sufficient to

4. When an information sets forth alternative allegations (such as *mens rea* or manner and means) in the conjunctive, the trial court may submit these issues to the jury in the disjunctive. *Warren v. State,* 810 S.W.2d 202, 203 (Tex.Crim.App.1991) (per curiam). However, if an information alleges an essential element of the offense with more specificity than required, the State must prove the specific allegation. *Chavez v. State,* 843 S.W.2d 586, 588 (Tex.Crim.App.1992). We employ both of these principles in constructing the hypothetically correct charge for Westfall's case.

support Westfall's conviction under the original information.

We have set out above the evidence tending to support the verdict. The following evidence tends to contradict the verdict:

- Westfall and his wife both testified that Gist never requested more supplemental food than they provided;
- Westfall and Gist made a judgment call not to segregate the weaker cattle for grazing because they wanted the entire herd to have access to grass across the creek;
- Westfall had limited financial resources available to care for the herd and exercised his judgment based on the resources available;
- he relied exclusively on Gist to care for the herd during April because the premature birth of a grandchild and his son's out-of-state wedding prevented him from being involved in the management of the herd during this time period;
- he testified that he had asked Gist in the Fall of 1995 to begin weaning the calves; and
- Dr. Sancho testified that in his opinion the average body condition of the cattle was "optimal."

### SUMMARY

The first four items tend to show that Westfall acted reasonably in his herd management decisions. However, Sancho described the herd as "grossly mismanaged." The Westfalls both stated that they provided Gist all the additional food he requested. However, Gist countered that he made repeated requests for additional food which Westfall did not provide, and he offered phone records to prove he had called Westfall. Westfall testified that he asked Gist to wean the calves, which Sancho says should have been done. Gist explained however that he did not have adequate food or space to properly wean

the calves. Finally, Sancho described the herd's average body condition as "optimal," but the SPCA investigator graded the herd much lower.

Many of these disputed issues rest on the jury's resolution of credibility. Giving appropriate deference to the jury on these issues, we cannot say that the verdict is "so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Clewis*, 922 S.W.2d at 134. Thus, the evidence is factually sufficient to support Westfall's conviction under the original information.

Because the evidence is legally and factually sufficient to support the conviction under the original information as it would have been submitted in a hypothetically correct charge, we conclude that Westfall was not harmed by the State's failed attempt to amend the information. *See Westfall I*, 970 S.W.2d at 596. Thus, we overrule his second point.

### PRODUCTION OF WITNESS STATEMENTS

 Westfall avers in his third point that the court erred by failing to require the prosecutor to produce Deputy Parks's offense report at the conclusion of his direct examination. *See* TEX.R.CRIM. EVID. 614(a).[5] The State responds that the report is not a "statement" subject to disclosure under Rule 614(a). The rule provides in pertinent part:

> After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, shall order the attorney for the state or the defendant and his attorney, as the case may be, to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter concerning which the witness has testified.

*Id.*

"Rule 614(a) codifies and expands the *Gaskin* rule." *Enos v. State*, 889 S.W.2d

---

5. We cite the rules of evidence in effect at the time of trial.

303, 305 (Tex.Crim.App.1994). Under *Gaskin,* the State was required to produce a witness's written statement to the defense at the conclusion of the witness's direct testimony. *See Gaskin v. State,* 172 Tex.Crim. 7, 9–10, 353 S.W.2d 467, 469–70 (1962) (op. on reh'g). The Court of Criminal Appeals construed *Gaskin* to require the State to produce the offense report of any testifying officer. *See, e.g., Campos v. State,* 468 S.W.2d 81, 83 (Tex.Crim.App. 1971).

In *Jenkins v. State,* the Court of Criminal Appeals considered whether Rule 614(a) requires production of offense reports as *Gaskin* did. On original submission, the Court held that such reports are "statements" for purposes of the rule. *Jenkins v. State,* 912 S.W.2d 793, 803–04 (Tex.Crim.App.1993). The Court concluded that the trial court erred by failing to require the State to produce the reports in issue and reversed the conviction. *Id.* at 804–05. On rehearing however, the Court determined that production of the reports was not required because they were not shown to be "in the prosecutor's possession." *Id.* at 819 (Tex.Crim.App.1995) (op. on reh'g). The Court did not revisit the question of whether offense reports are "statements" for purposes of the rule.

Our research reveals at least three intermediate courts which have included such reports in the category of "statements" which must be produced under Rule 614(a). *See Williams v. State,* 940 S.W.2d 802, 807 (Tex.App.—Fort Worth 1997, pet ref'd); *Amunson v. State,* 928 S.W.2d 601, 608 (Tex.App.—San Antonio 1996, pet. ref'd); *Cross v. State,* 877 S.W.2d 25, 27 (Tex.App.—Houston [1st Dist.] 1994, pet. ref'd).

■ In view of these authorities, we conclude likewise that an offense report prepared by a testifying officer which is in the possession of the prosecutor must be produced to the defendant at the conclusion of the officer's direct testimony, if counsel so requests. *See* Tex.R.Crim. Evid. 614(a).

■ In Westfall's case, the prosecutor told the trial court that she had Deputy Parks's report in her possession with the exception of some items she had previously copied and turned over to Westfall's counsel. Because she had the report in her possession, we conclude that the court erred when it failed to require her to produce it.

This error does not rise to the level of a constitutional violation however. Accordingly, we apply the harm analysis of appellate rule 44.2(b). *See* Tex.R.App. P. 44.2(b); *Fowler v. State,* 958 S.W.2d 853, 866 (Tex. App.—Waco 1997), *aff'd,* 991 S.W.2d 258 (Tex.Crim.App.1999). We must disregard the error unless it affected Westfall's "substantial rights." Tex.R.App. P. 44.2(b).

Under the former appellate rules, such an error was harmless if it did not deny the defendant an effective cross-examination of the officer or possible impeachment evidence. *See Keith v. State,* 916 S.W.2d 602, 606 (Tex.App.—Amarillo 1996, no pet.); *accord Jenkins,* 912 S.W.2d at 804 (on original submission). We have reviewed Deputy Parks's report and conclude that it is consistent with his testimony and does not contain any information which could have been used to impeach him. *See Keith,* 916 S.W.2d at 606. Thus, we conclude that the court's error in failing to require the prosecutor to produce the report did not affect Westfall's "substantial rights." *See* Tex.R.App. P. 44.2(b). Accordingly, we overrule his third point.

## BUSINESS RECORDS

Westfall claims in his fourth point that the court abused its discretion by not permitting him to introduce "memoranda" which his wife testified to be business records documenting phone calls received by the partnership during the pertinent time period. *See* Tex.R.Crim. Evid. 803(6).

■ We review a court's evidentiary rulings under an abuse-of-discretion standard. *Jones v. State,* 982 S.W.2d 386,

394 (Tex.Crim.App.1998). We will reverse only when the court's ruling falls outside the "zone of reasonable disagreement." *Id.; Montgomery v. State,* 810 S.W.2d 372, 391 (Tex.Crim.App.1991) (op. on reh'g).

Outside the presence of the jury, the trial court characterized the pertinent records as follows:

> I see some of the telephone records are on five inch by three inch sticky notes. One wonders what those have been stuck to for all these months, but I also see some two inch by two inch sticky notes. I see some typed out eight-and-a-half by eleven sheets, typewritten sheets, and I also see some eight-and-a-half by eleven sheets of paper with handwritten notes on it. So we've got this collection of notes here.

The court compared these records to Gist's phone bills and found numerous instances where the Westfalls had no record of a phone call shown by Gist's bills. The court sustained the State's objection to these records because it questioned their trustworthiness. *See* Tex.R.Crim. Evid. 803(6).

■ Given the disorganized manner in which the Westfalls apparently maintained these records and the discrepancies noted by the trial court, we cannot say the court's ruling lies outside the "zone of reasonable disagreement." *See Jones,* 982 S.W.2d at 394; *Montgomery v. State,* 810 S.W.2d at 391. Thus, we overrule Westfall's fourth point.

### ACCOMPLICE INSTRUCTION

■ Westfall contends in his fifth point that the court erred by failing to submit an accomplice witness instruction in the charge. He argues that Gist is also criminally responsible for the condition of the cattle.

■ When evidence in the record clearly shows a witness to be an accomplice as a matter of law, the court must instruct the jury accordingly. *Blake v.*

*State,* 971 S.W.2d 451, 455 (Tex.Crim.App. 1998). If the evidence is conflicting, the court should instruct the jury to resolve that issue. *Id.; Moore v. State,* 984 S.W.2d 783, 787 (Tex.App.—Waco 1999, no pet.). In this situation, the court must also instruct the jury that if it finds the witness to be an accomplice the jury cannot convict the defendant unless it finds corroborating evidence which tends to connect him to the commission of the offense. *Moore,* 984 S.W.2d at 787.

Gist exercised management over the herd. Thus, it could be argued that he is criminally responsible for this offense as an agent of the partnership. *See* Tex. Pen.Code Ann. § 7.23 (Vernon 1994). Because of his managerial responsibilities, Gist conceivably could be deemed a "high managerial agent" of the partnership. *Id.* § 7.21(2) (Vernon 1994).

On the other hand, the jury could have taken Gist's testimony that he repeatedly asked for additional food as evidence that he exercised due diligence to prevent the commission of the offense. *Id.* § 7.24 (Vernon 1994).[6] From this, the jury might conclude that he acted reasonably in discharging his management responsibilities. *See id.* § 42.09(a)(2) (person commits offense if he fails *unreasonably* to provide necessary food, etc.).

Accordingly, we conclude that a fact issue was raised on the issue of Gist's status as an accomplice. Therefore, the court erred by failing to submit this issue to the jury. *See Blake,* 971 S.W.2d at 455; *Moore,* 984 S.W.2d at 787.

■ Because Westfall requested such a charge, we must reverse his conviction if he suffered "some harm" as a result of the error. *Medina v. State,* 7 S.W.3d 633, 642 (Tex.Crim.App. 1999) (citing *Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Crim.App. 1985) (op. on reh'g)). We review the record for "actual, not just theoretical, harm

---

6. Due diligence would be an affirmative defense in the prosecution of the partnership, not an employee of the partnership. *See* Tex. Pen.Code Ann. § 7.24 (Vernon 1994).

to the accused." *Id.* at 643, (quoting *Almanza,* 686 S.W.2d at 174).

■ A defendant is not harmed by such an error if the record contains corroborating evidence which is "so strong that any reasonable jury would [find] it to be true." *Bacey v. State,* 990 S.W.2d 319, 330 (Tex.App.—Texarkana 1999, no pet. h.); *Tran v. State,* 870 S.W.2d 654, 658 (Tex.App.—Houston [1st Dist.] 1994, pet. ref'd) (op. on reh'g).

The record contains the following corroborating evidence tending to connect Westfall to the commission of the offense:

- Westfall's partnership owns the cattle;
- he played an active role in the management of the herd;
- he visited the property frequently during the pertinent time period, giving him knowledge of the condition of the cattle and the property; and
- he decided with Gist not to segregate the weaker cows and did not alter this plan despite arguably having seen firsthand evidence of his cattle's emaciated state.

Westfall does not deny what Deputy Parks and others found. He does not dispute Dr. Sancho's assessment of what could have been done differently to avoid what happened. Rather, he admitted the management decisions he made and sought to justify them as reasonable.

■ Westfall's own testimony provides corroborating evidence which is "so strong that any reasonable jury would [find] it to be true." *Bacey,* 990 S.W.2d at 330; *Tran,* 870 S.W.2d at 658; *see also Medina,* at 643. Thus, we conclude he was not harmed by the court's failure to submit an accomplice instruction in the charge. Accordingly, we overrule his fifth point.

We affirm the judgment.

Justice GRAY concurring.

1. *Flores v. State,* 82 Tex.Crim. 107, 198 S.W.

TOM GRAY, Justice, concurring.

The majority holds that the trial court erred by not physically writing on the face of the original indictment the words of the approved amendment. Basically the majority holds that an indictment cannot be amended by replacing one piece of paper that contains an error, omission, or vague words with another piece of paper with the correct words on it. Logic and common sense dictate that unless the statutes specifically require that the amendment must be made on the same piece of paper, there is no reason that an amended indictment cannot be made by reprinting the indictment with the language as amended.

When *Flores* was decided in 1917,[1] virtually all court documents were done in hand. Occasionally a preprinted form would be used, with blanks to be filled in to fit a particular situation. This was obviously before word processors, computers, desktop printers and copy machines. Technology has changed and it is now a relatively simple process to amend (change, improve, etc.) a document by replacing it with one that has been modified according to leave obtained from the trial court. This is the way many documents in judicial proceedings have been amended for years, particularly in the pleading of civil cases.

The majority relies heavily on language in *Ward v. State,* 829 S.W.2d 787 (Tex. Crim.App.1992). *Ward* held that approval of an amendment is distinct from the actual amendment. In *Ward,* an amendment had been approved but the Court of Criminal Appeals held "there being no alteration to the face of the indictment, we hold the indictment was never in fact amended." Id. at 792. One of the fundamental reasons was that without an actual change to the face of the indictment, the defendant must look to multiple documents for notice of the charges. This was analyzed and determined to be unconstitutional. The amended indictment in this case does not suffer the same defect. By making the

575 (1917).

changes on the face of a newly printed document, the requirement that the amendment be made on the face of the indictment is satisfied and the entire indictment is contained in a single document as required by the constitution.

*Ward* also discussed the legislative history of Art. 28.10 and 28.11.[2] The court summarizes this history as follows:

> What type substantive errors could be corrected in an indictment without thwarting the will of the grand jury or violating an accused's constitutional right to grand jury indictment in a felony cause? *Although there were references to a court or prosecutor amending a charging instrument, there was no testimony regarding the actual physical mechanics of making an amendment to a charging instrument.* This lack of testimony indicates to us the legislature did not attach any technical or particular meaning to the term "amend," and thus we will not frustrate legislative intent by applying a hypertechnical interpretation to the term.

*Ward* at 829 S.W.2d at 792 [emphasis in the original]. If the Court of Criminal Appeals is unwilling to frustrate legislative intent by applying a hypertechnical interpretation to the term "amend," neither will I.

I would hold that if an amendment is made by physically changing the wording of the indictment to the language which has been approved by the trial court pursuant to a motion as required by Article 28.10, Article 28.11 and *Ward*, it meets the "change on the face of the indictment" requirement of *Ward*. The defendant need not look beyond the single amended document to determine what the charges are, as required by the constitution and as discussed at length in *Ward*.

I see no reason that an amendment to an indictment cannot have the same meaning here as it does in civil practice. *See* Tex.R. Civ. P. 62–65. Such an amendment

complies with both the spirit and the purpose of Article 28.11, *Flores* and its progeny, including *Ward* and *Rent v. State*, 838 S.W.2d 548 (Tex.Crim.App.1992) (op. on reh'g). I would hold that the trial court did not err by allowing the amendment to the indictment to be made by preparing an instrument which contained the altered language for the indictment as approved by the trial court.

While the majority holds the trial court erred in allowing an amendment to be made by a new instrument with the correct language in it, they hold that the evidence was sufficient to support a conviction under the indictment as it existed prior to the attempted amendment. I find the evidence was sufficient to support the conviction under the amended indictment, accordingly, I express my concurrence in the result, if not the reasoning.

---

2. Tex.Code.Crim. Proc. Ann. art. 28.10 and 28.11 (Vernon 1989).