Opinion issued January 21, 2003 




















In The
Court of Appeals
For The
First District of Texas
 

 
 
NO. 01-00-01028-CR
____________
 
ARTHUR EDMUND URESTI, Appellant
 
V.
 
THE STATE OF TEXAS, Appellee
 

 
 
On Appeal from the County Criminal Court at Law No. 6
Harris County, Texas
Trial Court Cause No. 0996903
 

 
 
O P I N I O N
          After the denial of his motions to suppress evidence, appellant, Arthur Edmund
Uresti, pleaded guilty to the misdemeanor offense of keeping a gambling place. The
trial court found appellant guilty and, pursuant to an agreed recommendation by the
State, assessed punishment at 30 days in jail. The trial court then, over appellant’s
objection, ordered appellant to pay $4,000 in restitution to the Houston Police
Department as reimbursement for its expenses in investigating and prosecuting
appellant. In 10 points of error, appellant asserts that the trial court erred in ordering
him to pay restitution to the Houston Police Department and in overruling his motion
and amended motion to suppress physical evidence, motion to suppress trap and trace
evidence and pen register evidence, and motion to suppress call forwarding evidence.
          We reverse and vacate in part and affirm in part.
Factual and Procedural Background
          At the hearing on appellant’s motions to suppress evidence, the State stipulated
that appellant was arrested for and charged with the instant offense based on evidence
obtained pursuant to the execution of a search warrant at appellant’s residence. 
Appellant introduced into evidence, without objection, the search warrant, its
underlying 24-page affidavit, and the State’s applications for, and the court orders
approving the use of, trap and trace, pen register, caller identification, and call
forwarding equipment on appellant’s two telephone lines.
          The record indicates that, on February 22, 2000, the State filed an application
for a court order to install and operate a trap and trace device


 for two telephone
numbers subscribed to appellant at his residence. The State asserted that the
installation and utilization of the device was material to the ongoing investigation of
an illegal bookmaking operation, allegedly run by appellant. The State further
asserted that the use of the device would assist in identifying other participants and
co-conspirators of the bookmaking operation by providing information concerning
the subscribers of telephone services who placed calls to the two telephone numbers. 
The order obtained by the State provided for the operation of the device from
February 25 through March 25, 2000.
          On March 22, 2000, the State filed an identical application for a trap and trace
device and received another order allowing the operation of the device from March
26 through April 25, 2000. Also on March 22, 2000, the State obtained a court order
to determine the final destination of calls made to the two telephone numbers, i.e., to
see if any incoming calls were forwarded to another telephone number.
          On April 11, 2000, the State filed an application for a court order to install and
use a pen register


 and trap and trace device for one of the telephone numbers
subscribed to appellant at his residence. This application specifically requested an
order to install
a mechanical or electronic device that attaches to the telephone line and
is capable of recording an incoming electronic or other impulse that
identifies the originating number of an instrument or device from which
a wire or electronic communication was transmitted to the target
telephone and that the trap and trace device use a calling feature known
as enhanced caller identification (or “Caller ID”), if available. 

(Emphasis added.) It further clarified as follows:
 
While this application seeks a trap and trace device to capture and
identify telephone numbers dialed to the target telephone and subscriber
information about those numbers and, while Section 1(7), Article 18.21,
Code of Criminal Procedure, which is the Texas law concerning the
installation and use of a trap and trace device, specifically excludes
“caller identification” from the definition of a trap and trace device, this
Application does not concern caller identification, (or “Caller ID”), as
that term is used to describe the arms-length business transaction
between any subscriber and telephone company under Subchapter E,
Chapter 55, Utilities Code. Although this application does not involve
the commercial transaction know as Caller ID, it does involve using the
Caller ID calling feature technology in order to more effectively
implement installation and use of the underlying trap and trace device.

(Emphasis added.) The State asserted that information obtained from the pen register,
trap and trace device, and caller identification feature was material to the ongoing
investigation. The order obtained by the State authorized the installation and use of
the requested “pen register, trap and trace device, and caller identification feature on
the target telephone” for a period of 60 days.
          Houston Police Officer G. C. Fencl, an officer assigned to the Vice
Division/Organized Gambling Squad, prepared a 24-page, typed, single-spaced
affidavit in support of the search warrant, stating his belief that appellant participated
in, and committed the offenses of, gambling promotion, engaging in bookmaking,
keeping a gambling place, communicating gambling information, and money
laundering. The affidavit further alleged that appellant was in the unlawful
possession of gambling paraphernalia. Officer Fencl explained that, although he had
initially received information from an unidentified informant that appellant was
running an illegal sports bookmaking operation, Fencl knew appellant from previous
investigations of illegal bookmaking and was aware of appellant’s previous arrests
for gambling promotion and engaging in organized criminal activity. Fencl received
information that appellant was using two telephone numbers for providing betting
line information and for accepting wagers on the 1999-2000 college and professional
basketball season games.
          In the affidavit, Officer Fencl provided detailed information, based on his
experience and observations, about the operations of bookmakers, their financial
backers and bettors and how money is made, lost, and paid on wagers. Fencl also
detailed his knowledge of “booking hours” and explained that term as the “ period of
time that is approximately one and a half to two hours prior to the beginning of the
earliest scheduled sporting event and ending at a predetermined time that has been
provided to bettors.”
          Officer Fencl noted that an analysis of the trap and trace results of one of
appellant’s telephone numbers showed that from February 25, 2000 through March
2, 2000, 138 calls out of 141 were placed to that number during “booking hours.” A
second analysis for this number from March 3, 2000 through March 9, 2000, revealed
that 135 out of 136 calls were made during “booking hours.” Several other
subsequent analyses of trap and trace results on this number continued the pattern and
indicated a similar high percentage of calls were received during “booking hours.” 
Officer Fencl observed a “distinctive pattern” of telephone calls placed to appellant’s
telephone numbers “one right after another” during “booking hours.” Moreover,
Fencl obtained subscriber information associated with the telephone numbers
received from the trap and trace, and was able to identify several subscribers known
as gamblers and bookmakers.
          Officer Fencl stated that, based on his experience and previous observations
of bookmaking operations, bookmakers keep their own documents and gambling
paraphernalia, i.e., line sheets, bet slips, recap sheets, money, canceled checks,
financial records, and other gambling instruments. He noted that a bookmaker will
maintain and keep these items and documents for long periods of time. Fencl also
stated that bookmakers also keep gambling documentation on computers, computer
disks, and tapes. He noted that he believed that appellant would have such gambling
documentation and paraphernalia at his residence, which Fencl and other officers had
placed under surveillance.
          On April 19, 2000, the State obtained and executed the search warrant on
appellant’s residence and vehicle and found and seized, among other things,
approximately $42,926 in cash.
          Following a hearing, the trial court denied appellant’s motion and amended
motion to suppress physical evidence, motion to suppress trap and trace evidence and
pen register evidence, and motion to suppress call forwarding evidence.
“Caller Identification” and “Call Forwarding” Evidence
          In points of error two, four, and five, appellant contends that the trial court
erred in overruling his motions to suppress evidence because article 18.21 of the
Texas Code of Criminal Procedure


 prohibits the State from obtaining “caller
identification” and “call forwarding” evidence and because there is no statutory basis
for obtaining “call forwarding” evidence.
          Appellant argues that article 18.21, which governs the installation and use of
pen registers and trap and trace devices by law enforcement, expressly precludes the
State from obtaining “caller identification” information. He further argues that the
State is therefore also precluded from obtaining “call forwarding” information. 
Appellant contends the obtaining of such evidence “was totally illegal, unauthorized,
and specifically excluded” under the provisions of article 18.21.
          An authorized peace officer may request an attorney for the State to file an
application for the installation and use of a pen register and/or trap and trace device
“to obtain information material to the investigation of a criminal offense.” See Tex.
Code Crim. Proc. Ann. art. 18.21, §§ 2(a), (b). Moreover, a district or criminal
district attorney may, personally on his own motion, file such an application. See id. 
A judge of the judicial district in which the proposed installation will be made, on
presentation of a sworn written application, may then order the installation and
utilization of a pen register and/or trap and trace device. See Tex. Crim. Proc. Code
Ann. art. 18.21, §§ 2(d), (e).
          Article 18.21, section 1(7) provides that the term “trap and trace device” does
not include a device or telecommunications network used in providing:
(A)a caller identification service authorized by the Public Utility
Commission of Texas under Subchapter E, Chapter 55, Utilities
Code;
 
(B)the services referenced in Section 55.102(b), Utilities Code; or 
 
(C)a caller identification service provided by a commercial mobile
radio service provider licensed by the Federal Communications
Commission.

Tex. Crim. Proc. Code Ann. art. 18.21, §§ 1(7)(A), (B), (C) (emphasis added). The
Utilities Code defines the caller identification service that may be provided by a
telecommunications utility or provider and regulated by the Public Utility
Commission of Texas:
“Caller identification service” means a service that provides caller
identification information to a device that can display the information. 

Tex. Util. Code Ann. § 55.101(2) (Vernon 1998) (emphasis added).
          As contemplated by article 18.21, section 1(7), the trap and trace device to be
utilized may not, itself, be a device “used in providing” a “caller identification
service” to a private subscriber. Here, the State did not request that the court order
the installation and utilization of a device to be used in providing a caller
identification service. Rather, the State specifically requested that the installed trap
and trace device “use a calling feature known as enhanced caller identification (or
“Caller ID”), if available.”
          In its application, the State distinguished article 18.21, section 1(7) and noted,
“this Application does not concern caller identification (or “Caller ID”), as that term
is used to describe the arms-length business transaction between any subscriber and
telephone company under Subchapter E, Chapter 55, Utilities Code.” The application
clearly stated that, “Although this Application does not involve the commercial
transaction known as Caller ID, it does involve using the Caller ID calling feature
technology in order to more effectively implement installation and use of the
underlying trap and trace device.” (Emphasis added.)
          Contrary to appellant’s argument, article 18.21, section 1(7) does not preclude
the use of caller identification technology to obtain caller identification information. 
The sole purpose of a trap and trace device is, in fact, to record “incoming” electronic
or other impulses “to identify the originating number” of incoming telephone calls. 
See Tex. Crim. Proc. Code Ann. art. 18.21, § 1(7). Article 18.21, section 1(7)
simply prohibits the utilization of a device “used in providing” a caller identification
“service” to a private subscriber to obtain this information.
          Moreover, article 18.21 does not preclude the State from obtaining “call
forwarding” information. As noted above, the purpose of a trap and trace device is
to identify incoming calls, not to determine their final destination. “Caller
identification” and “call forwarding” perform two separate and distinct functions, and
article 18.21 does not address or concern “call forwarding” in any way. Appellant’s
argument that article 18.21 logically precludes the State from obtaining “call
forwarding” evidence is without merit.
          Appellant further asserts that the State obtained “call forwarding” information
in the “total absence of any type of statutory authorization to do so.” The State,
separate from its application to install and use a pen register and trap and trace device,
applied for and received two court orders to determine “the final destination” of
telephone calls made to appellant’s two telephone numbers. In its applications for the
court orders, the State asserted that “the telephone numbers and the instruments
assigned thereto are being utilized and employed for the purpose of furthering
criminal activity” and that “call forwarding” is being activated “in furtherance of said
activity.”
          Contrary to appellant’s assertion, a governmental entity may require a provider
of an electronic communication service to disclose a record or other information
pertaining to a subscriber to or customer of such service when the governmental
entity obtains a court order for such a disclosure. 18 U.S.C. § 2703(c)(1)(B) (1993
& Supp. 2003). A governmental entity may obtain such an order only if it offers
specific and articulable facts showing there are reasonable grounds to believe that the
contents of the record or other information is relevant to an ongoing criminal
investigation. 18 U.S.C. § 2703(d) (1993 & Supp. 2003). Thus, appellant’s argument
that the State obtained “call forwarding” information in the absence of any statutory
authority is without merit.
          We overrule appellant’s second, fourth, and fifth points of error.

SearchIn point of error three, appellant contends that the trial court erred in overruling
his motion to suppress trap and trace evidence and pen register evidence because the
gathering of such evidence constituted a search, unsupported by probable cause, in
violation of his right to be free from unreasonable searches and seizures,


 as secured
by the Texas Constitution.



          The statutory mechanism allowing the State to obtain pen register and trap and
trace information does not require a showing of probable cause. Rather, an
application for the use of a pen register or a trap and trace device must simply “state
that the installation and utilization of the pen register or trap and trace device will be
material to the investigation of a criminal offense.” Tex. Code Crim. Proc. Ann.
art. 18.21, § 2(c) (emphasis added).
          Article I, § 9 of the Texas Constitution provides as follows:
The people shall be secure in their persons, houses, papers and
possessions, from all unreasonable seizures or searches, and no warrant
to search any place, or to seize any person or thing, shall issue without
describing them as near as may be, nor without probable cause,
supported by oath or affirmation.

Tex. Const. art. I, § 9. Similarly, the Fourth Amendment recognizes the inviolable
“right of the people to be secure in their persons, houses, papers, and effects, against
unreasonable searches and seizures.” U.S. Const. amend. IV.
          Even if the language of Article I, § 9 were identical to that of the Fourth
Amendment, the Texas Court of Criminal Appeals has noted that Texas courts “must
construe that language according to our own lights.” Richardson v. State, 865
S.W.2d 944, 948 (Tex. Crim. App. 1993). Nevertheless, the Court also acknowledged
that the two provisions are “in all material aspects, the same,” and noted that Texas
courts should not hesitate “to examine Fourth Amendment analogues, or the
construction other states have given their own constitutional provisions regarding
search and seizure, for guidance.” Id.
          The substantive question of what is a “search” has been effectively merged
with what had been a procedural question of “standing” to challenge a search. Id. 
The purpose of both the Fourth Amendment and Article I, § 9 is “to safeguard an
individual’s “legitimate expectation of privacy” from unreasonable governmental
intrusions.” Id. The test for determining the existence of a “legitimate expectation
of privacy” for a particular individual raises two questions. The first is whether the
individual, by his conduct, has “exhibited an actual (subjective) expectation of
privacy,” i.e., whether the individual has shown that he seeks to preserve something
as private. Smith v. Maryland, 442 U.S. 735, 740, 99 S. Ct. 2577, 2580 (1979);
Richardson, 865 S.W.2d at 948. The second is whether the individual’s subjective
expectation of privacy is “one that society is prepared to recognize as ‘reasonable,’”
i.e., whether the individual’s expectation, viewed objectively, is “justifiable” under
the circumstances. Smith, 442 U.S. at 740, 99 S. Ct. at 2580; Richardson, 865 S.W.2d
at 948.
Pen Register
          In regard to whether the use of pen register constitutes a search, the Court of
Criminal Appeals has noted that, in regard to both the Fourth Amendment and Article
I, § 9, the answer depends upon whether an individual demonstrates a “‘legitimate
expectation of privacy’ in the numbers he dialed on the telephone.” Richardson, 865
S.W.2d at 949. As clarified by the Court:
In other words, in determining the legitimacy of appellant’s expectation
of privacy, the appropriate inquiry is whether appellant expected that the
numbers he dialed on the telephone would be free from governmental
intrusion, and, if he did, is this expectation one that society is prepared
to recognize as reasonable.

Id.
          The United States Supreme Court, in Smith, unequivocally held that the
installation and use of a pen register is not a search under the Fourth Amendment. 
Smith, 442 U.S. at 745-46, 99 S. Ct. at 2583. In regard to whether a defendant could
harbor a subjective expectation of privacy, the Supreme Court expressed its doubt
that people in general entertain any actual expectation of privacy in the telephone
numbers they dial, and reasoned:
All telephone users realize that they must “convey” phone numbers to
the telephone company, since it is through telephone company switching
equipment that their calls are completed. All subscribers realize,
moreover, that the phone company has facilities for making permanent
records of the numbers they dial, for they see a list of their long-distance
(toll) calls on their monthly bills. In fact, pen registers and similar
devices are routinely used by telephone companies “for the purposes of
checking billing operations, detecting fraud and preventing violations
of law.” . . . Electronic equipment is used not only to keep billing
records of toll calls, but also “to keep a record of all calls dialed from a
telephone which is subject to a special rate structure.” . . . Pen registers
are regularly employed “to determine whether a home phone is being
used to conduct a business, to check for a defective dial, or to check for
overbilling.” . . . Although most people may be oblivious to a pen
register’s esoteric functions, they presumably have some awareness of
one common use: to aid in the identification of persons making
annoying or obscene calls. . . . Most phone books tell subscribers, on a
page entitled “Consumer Information,” that the company “can frequently
help in identifying to the authorities the origin of unwelcome and
troublesome calls.” . . . Telephone users, in sum, typically know that
they must convey numerical information to the phone company; that the
phone company has facilities for recording this information; and that the
phone company does in fact record this information for a variety of
legitimate business purposes. Although subjective expectations cannot
be scientifically gauged, it is too much to believe that telephone
subscribers, under these circumstances, harbor any general expectation
that the numbers they dial will remain secret.

Id., 442 U.S. at 742-43, 99 S. Ct. at 2581 (citations omitted). In response to Smith’s 
argument that he demonstrated that he had an expectation of privacy in the telephone
numbers he dialed because he used the telephone in his house to the exclusion of all
others, the Supreme Court stated that the site of the call was immaterial for purposes
its analysis:
Although petitioner’s conduct may have been calculated to keep the
contents of his conversation private, his conduct was not and could not
have been calculated to preserve the privacy of the number he dialed. 
Regardless of his location, petitioner had to convey that number to the
telephone company in precisely the same way if he wished to complete
his call. The fact that he dialed the number on his home phone rather
than on some other phone could make no conceivable difference, nor
could any subscriber rationally think that it would.

Id., 442 U.S. at 743, 99 S. Ct. at 2582.
          Moreover, the Supreme Court noted that, even if a defendant harbored some
subjective expectation that the telephone numbers he dialed would remain private,
this expectation is not “one that society is prepared to recognize as ‘reasonable’”
because “a person has no legitimate expectation of privacy in information he
voluntarily turns over to third parties.” Id., 442 U.S. at 743-44, 99 S. Ct. at 2582. 
The Supreme Court noted that, when Smith used his telephone, he voluntarily
conveyed numerical information to the telephone company and “exposed” that
information to its equipment in the ordinary course of business and, thus, he assumed
the risk that the company would reveal to police the numbers he dialed. Id., 442 U.S.
at 744, 99 S. Ct. at 2582.
          The Supreme Court concluded that Smith, in all probability, entertained no
actual expectation of privacy in the telephone numbers he dialed, and that, even if he
did, his expectation was not “legitimate”; consequently, the installation and use of a
pen register was not a “search,” and no warrant was required. Id., 442 U.S. at 745-46,
99 S. Ct. at 2583.
          In Richardson, the Texas Court of Criminal Appeals, expressly critical of the
Supreme Court’s reasoning in Smith, held that “the use of a pen register may well
constitute a ‘search’ under Article I, § 9 of the Texas Constitution.” 865 S.W.2d at
953 (emphasis added). The Amarillo Court of Appeals, following the reasoning of
Smith, had previously held that the use of a pen register was not a search under
Article I, § 9. See Richardson v. State, 831 S.W.2d 78, 79 (Tex. App.—Amarillo
1992), vacated and remanded, 865 S.W.2d 944, 954 (Tex. Crim. App. 1993). In
remanding the case to the court of appeals, the Court of Criminal Appeals noted as
follows:
We hold only that the court of appeals erred to dispose of appellant’s
many points of error on appeal on the basis of a broad holding that the
use of a pen register never, under any circumstances, constitutes a
“search” under Article I, § 9.

Richardson, 865 S.W.2d at 953-54 n.9. On remand, the Richardson court of appeals
held that Richardson did not have standing to complain about an actual expectation
of privacy because he disclosed the fact that he was calling the telephone numbers in
question to other third parties. Richardson v. State, 902 S.W.2d 689, 693-94 (Tex.
App.—Amarillo 1995, no pet.).
          Following the holding in Richardson that a pen register may well constitute a
search, an accused still has the burden of proving facts establishing a legitimate
expectation of privacy. McArthur v. State, 1 S.W.3d 323, 329 (Tex. App.—Fort
Worth 1999, no pet.) (citing Calloway v. State, 743 S.W.2d 645, 650 (Tex. Crim.
App. 1988)). The determination of a person’s actual expectation of privacy is to be
measured by the person’s conduct. Richardson, 865 S.W.2d at 948. Thus, appellant
had the burden of establishing (1) that he exhibited by his conduct “an actual
(subjective) expectation of privacy,” and (2) that his subjective expectation was
“justifiable,” i.e., “one that society is prepared to recognize as reasonable.” Id. at
948-49.
          Here, appellant, under questioning from defense counsel, testified as follows
that the telephone numbers in question were his “personal telephone numbers”:
[Defense Counsel]:And you pay the bill for those numbers?
          [Appellant]:                     Yes, I do.
          [Defense Counsel]:          To Southwestern Bell?
          [Appellant]:                     Yes, I do.
[Defense Counsel]:As to—you have a call forwarding feature on
that telephone?
 
          [Appellant]:                     Yes, I do.
[Defense Counsel]:And as to the phone calls you make and
phone calls that you receive, do you feel as
though you have a privacy interest in those
telephone numbers?
 
          [Appellant]:                     Yes, I do.
          [Defense Counsel]:          And where you forward them to?
          [Appellant]:                     Yes, I do.
          [Defense Counsel]:          No further questions.
          Although appellant stated generally that he felt as though he had a “privacy
interest” in “those telephone numbers,” he did not articulate why he felt that way.
More importantly, appellant failed to explain what conduct he exhibited to
demonstrate an actual expectation of privacy in the numbers he dialed on his
telephones. In fact, the only “conduct” that appellant testified to was that he
subscribed to a call forwarding service from his telephone company.
          Appellant, in his brief, argues that “in this day and age of increasingly
sophisticated telecommunications technology, the availability of such items as
‘anonymous calling’ and ‘anonymous call rejection’ and ‘call blocking’ or ‘caller
blocking,’ reflect a recognition that the private communications users exchange, and
more importantly for purposes of the case, even their identity, will remain exactly
so—private and secure from prying eyes.”
          On the contrary, these new technologies demonstrate, in fact, that individuals
actually have the burden of adding services like an “anonymous calling” feature if
they want a record of who they call to remain private and, thus, retain an expectation
of privacy. Given the prevalence of services like caller identification, an individual’s
expectation that the telephone numbers he dials on his telephone will not be
published to the rest of the world is no longer objectively reasonable.



          We hold that appellant failed to meet his burden of proving facts establishing
that he exhibited by his conduct “an actual (subjective) expectation of privacy,” in the
numbers he dialed on his telephones. Because appellant failed to meet his initial
burden, it logically follows that he failed to meet his additional burden of showing
that any subjective expectation of privacy harbored by him in this case was
“justifiable,” i.e., “one that society is prepared to recognize as reasonable.” Thus, we
hold that the State’s use of a pen register in this case was not a search under Article
I, § 9 of the Texas Constitution.
Trap and Trace Device
          In regard to whether the use of a trap and trace device constitutes a search
under Article I, § 9, we note that the Fort Worth Court of Appeals has held, “for the 
reasons enunciated in Richardson, use of a ‘trap and trace’ device may constitute a
search under article I, section 9.” McArthur, 1 S.W.3d at 329 n.3. We respectfully
disagree.
          As noted above, a pen register actually “records or decodes electronic or other
impulses to identify numbers dialed or otherwise transmitted on the telephone line,” 
i.e., the numbers that one dials on one’s own telephone. See Tex. Code Crim. Proc.
Ann. art. 18.20 § 1(14) (emphasis added). On the other hand, a trap and trace device
actually “records an incoming electronic or other impulse that identifies the
originating number of an instrument or device from which a wire or electronic
communication was transmitted,” i.e., the numbers assigned to those calling one’s
telephone. See Tex. Code Crim. Proc. Ann. art. 18.21 § 1(7) (emphasis added). 
The distinction is significant. It does not logically follow that because one may have
a legitimate expectation of privacy in the numbers that one dials on one’s telephone,
that one would have such an expectation of privacy in the telephone numbers
belonging to other individuals placing calls to one’s telephone.
          We hold that the use of a trap and trace device does not constitute a search
under Article I, § 9 of the Texas Constitution. Nevertheless, appellant, in this case,
failed to meet his burden of proving facts establishing that he exhibited by his
conduct “an actual (subjective) expectation of privacy,” in the telephone numbers
belonging to other individuals placing calls to his telephone numbers. Moreover,
because appellant failed to meet his initial burden, he further failed to show that any
subjective expectation of privacy harbored by him in this case was “justifiable.” 
Thus, even assuming that the use of a trap and trace device might, under certain
circumstances, be considered a search under Article I, § 9, we further hold that the
State’s use of a trap and trace device in this case was not a search.
          We overrule point of error three.Probable Cause and Conclusory Affidavit
          In points of error seven and eight, appellant contends that the trial court erred
in overruling his motion and amended motion to suppress physical evidence because
the affidavit in support of the search warrant, in violation of Article I, § 9, did not
establish probable cause to support the issuance of the search warrant and did not
establish probable cause that appellant was engaging in any gambling activity. In
point of error six, appellant contends that the trial court erred in overruling his motion
and amended motion to suppress physical evidence because the search warrant
affidavit, in violation of Article I, § 9, was “purely conclusory in nature.”
          The task of a magistrate in issuing a search warrant is to make a practical,
common-sense decision whether, given all the circumstances set forth in the warrant’s
supporting affidavit, including the veracity and basis of knowledge of persons
supplying hearsay information, there is a fair probability that contraband or evidence
of a crime will be found in a particular place. Illinois v. Gates, 462 U.S. 213, 238,
103 S. Ct. 2317, 2332 (1983). The duty of a reviewing court is simply to ensure that
the magistrate had a substantial basis for concluding that probable cause existed to
support the issuance of the warrant. Id. The Gates “totality of the circumstances” test
applies in Texas probable cause determinations made under Article I, § 9 and article
18.01 of the Code of Criminal Procedure.


 Eisenhauer v. State, 754 S.W.2d 159, 164
(Tex. Crim. App.), cert. denied, 488 U.S. 848, 109 S. Ct. 127 (1988), overruled in
part, Heitman v. State, 815 S.W.2d 681, 684-85, 690 (Tex. Crim. App. 1991); see
Amores v. State, 816 S.W.2d 407 (Tex. Crim. App. 1991) (applying Gates/Eisenhauer
“totality of the circumstances” test, post-Heitman, to determine probable cause in
warrantless search and seizure context).
          In conducting this analysis, a reviewing court should not conduct a de novo
review to determine the sufficiency of an affidavit for probable cause. Gates, 462
U.S. at 236, 103 S. Ct. at 2331. The magistrate’s determination of probable cause
should be paid great deference by reviewing courts. Id. The test for determination
of probable cause is whether the magistrate had a substantial basis for concluding that
a search would uncover evidence of wrongdoing. Id.
          Probable cause to support the issuance of a search warrant exists where the
facts submitted to the magistrate are sufficient to justify a conclusion that the object
of the search is probably on the premises to be searched at the time the warrant is
issued. Cassias v. State, 719 S.W.2d 585, 587 (Tex. Crim. App. 1986). A search
warrant affidavit must be read in a common-sense and realistic manner, and
reasonable inferences may be drawn from the facts and circumstances contained
within its four corners. Id. at 587-88.
          Appellant contends that “the affidavit is premised on mere conclusory
statements of the affiant as it relates to defendant. . . . It is evident throughout the
affidavit that there is no basis for the conclusory statements made about the defendant
. . . his residence . . . or his automobile.” Appellant argues that the “entire gist” of the
search warrant affidavit “are [sic] contentions that, based on pen registers and trap
and trace devices installed on Appellant’s two telephones, Appellant received a
certain number of telephone calls during ‘booking hours.’” He claims that the
reviewing magistrate had no details of any “booking hours.” Appellant also points
out that no witness saw him engage in any gambling activity.
          Here, the search warrant was supported by a detailed, 24-page, typed, single-spaced affidavit. In the affidavit, Houston Police Officer G. C. Fencl, the affiant,
stated that he was assigned to the Vice Division/Organized Gambling Squad and that
he had over seven years of experience in investigating bookmakers and bookmaking
operations. In the affidavit, Officer Fencl provided detailed information, based on his
experience and observations, about the operations of bookmakers, their financial
backers and bettors and how money is made, lost, and paid on wagers. Fencl also
detailed his knowledge of “booking hours,” and he explained that term as the “ period
of time that is approximately one and a half to two hours prior to the beginning of the
earliest scheduled sporting event and ending at a predetermined time that has been
provided to bettors.”
          Although Officer Fencl initially received information from an unidentified
informant that appellant was running an illegal sports bookmaking operation, Fencl 
knew appellant from previous investigations of illegal bookmaking and was aware
of appellant’s previous arrests for gambling promotion and engaging in organized
criminal activity. Fencl received information that appellant was using two telephone
numbers for providing betting line information and for accepting wagers on the 1999-2000 college and professional basketball season games.
          Officer Fencl then, with grand jury subpoenas, obtained information from
Southwestern Bell Telephone Company that appellant was, in fact, the subscriber to
those telephone numbers. Fencl also obtained court orders for the use of a trap and
trace device on these telephone numbers from February 25 through March 25, 2000,
and from March 26, 2000 through April 25, 2000, to obtain information on the
telephone numbers of callers to appellant’s telephones. The analysis of the trap and
trace results of one of appellant’s telephone numbers showed that from February 25,
2000 through March 2, 2000, 138 calls out of 141 were placed during “booking
hours.” A second analysis for this number from March 3, 2000 through March 9,
2000, revealed that 135 out of 136 calls were made during “booking hours.” Several
other subsequent analyses of trap and trace results on this number continued the
pattern and indicated a similar high percentage of calls were received during
“booking hours.” Officer Fencl confirmed that these calls were made during the
1999-2000 college and professional basketball season.
          Officer Fencl further stated that information concerning the final destination
of calls made to appellant’s phone numbers, or call forwarding information, during
“booking hours” indicated that the calls were not forwarded to another telephone
number. Fencl noted that appellant’s telephone numbers were not listed as any type
of commercial business and that the exceptionally large number of telephone calls
made to appellant’s personal telephone numbers was consistent with bookmaking
operations. Fencl noticed a “distinctive pattern” of telephone calls placed to
appellant’s telephone numbers “one right after another” during “booking hours.”
Moreover, Fencl obtained subscriber information associated with the telephone
numbers received from the trap and trace, and was able to identify several subscribers
known as gamblers and bookmakers.
          Officer Fencl stated that, based on his experience and previous observations
of bookmaking operations, bookmakers keep their own documents and gambling
paraphernalia, i.e., line sheets, bet slips, recap sheets, money, canceled checks,
financial records, and other gambling instruments. He noted that a bookmaker will
maintain and keep these items and documents for long periods of time. Fencl also
stated that bookmakers also keep gambling documentation on computers, computer
disks, and tapes. He noted that he, thus, believed that appellant would have gambling
documentation and paraphernalia at his residence, which Fencl and other officers had
placed under surveillance.
          Although the above is only a brief review of Officer Fencl’s affidavit, and by
no means reflects all the information contained therein, it is apparent that appellant’s
argument that the “entire gist” of the search warrant affidavit consists of contentions
that appellant received a certain number of telephone calls during “booking hours”
is without merit. Officer Fencl’s detailed, 24-page, single-spaced affidavit was not
merely conclusory, but provided the magistrate with a substantial basis for concluding
that a search of appellant’s residence would uncover evidence of gambling
promotion, bookmaking, and keeping a gambling place. Moreover, appellant did not
alert the trial court and has not directed this Court to any specific conclusory
statements contained in the affidavit.
          Appellant also argues that the trial court erred in denying his motion and
amended motion to suppress physical evidence because there was no probable cause
to believe that appellant was present in his condominium at the time when telephone
calls were received during “booking hours.” However, in regard to the search warrant
affidavit, it was not necessary for the affiant to articulate facts showing that appellant
was present at the condominium during “booking hours,” essentially proving that he
was participating directly in criminal activity.
          The pertinent question is whether the facts submitted to the magistrate are
sufficient to justify a conclusion that the items, which are the object of the search, are
probably on the premises to be searched at the time the warrant issues. Massey v.
State, 933 S.W.2d 141, 149 (Tex. Crim. App. 1996). As the State was only required
to demonstrate a probability that evidence of gambling promotion, bookmaking, or
keeping a gambling place would be found in appellant’s condominium, it is irrelevant
whether appellant was actually present at the condominium during “booking hours.” 
          We hold that, under the totality of the circumstances, giving due weight to the
preference accorded to the magistrate’s finding, the search warrant affidavit provided
the magistrate with a substantial basis for concluding that evidence of gambling
promotion, bookmaking, and keeping a gambling place would probably be found in
appellant’s residence upon execution of the search warrant.
          We overrule points of error six, seven, and eight.
Stale Information
          In point of error nine, appellant contends that the trial court erred in overruling
his motion and amended motion to suppress evidence because the information
contained in the search warrant affidavit was “stale” and over 30-days old, in
violation of Article I, § 9, by the time the search warrant was executed.
           To justify a magistrate’s finding that an affidavit is sufficient to establish
probable cause to issue a search warrant, the facts set out in the affidavit must not
have become stale by the time the magistrate issues the search warrant. Hafford v.
State, 989 S.W.2d 439, 440 (Tex. App.—Houston [1st Dist.] 1999, pet. ref’d). The
proper method to determine whether the facts supporting a search warrant have
become stale is to examine, in light of the type of criminal activity involved, the time
elapsing between the occurrence of the events set out in the affidavit and the time the
search warrant was issued. Id.
          Appellant contends that the search warrant affidavit was based on pen register
information and trap and trace information that was gathered more than 30 days prior
to the execution of the warrant. The search warrant was issued and executed on April
19, 2000. On its face, the affidavit refers to pen register information and trap and
trace information regarding telephone calls to and from appellant’s two telephone
numbers made between February 25, 2000 and April 18, 2000. Thus, there was no
time lapse between the occurrence of the events contained in the affidavit and the
time the warrant was issued. Appellant’s argument is without merit.
          We overrule point of error nine.
Description of Seized Items
          In point of error 10, appellant contends that the trial court erred in overruling
his motion and amended motion to suppress evidence because the search warrant, in
violation of Article I, § 9, failed to “‘particularly describe’ telephones, tape recorders
and tapes” as items to be seized from appellant’s condominium. Appellant argues
that the police officers executing the warrant should not have seized two “tape
recordings” from his condominium because the tape recordings were not contraband
per se.
          The Texas Constitution provides that “no warrant to search any place, or to
seize any person or thing, shall issue without describing them as near as may be.” 
Tex. Const. art. I, § 9 (emphasis added). The items to be seized must be described
with sufficient particularity such that the executing officer is left with no discretion
to decide what may be seized. Winkfield v. State, 792 S.W.2d 727, 731 (Tex.
App.—Corpus Christi 1990, pet. ref’d). However, to require police to set forth
information they could not know, under the guise of particularity, would thwart
reasonable police activity. Id. at 732.
          The record does not contain the actual “tape recordings” or the search warrant
return. Moreover, appellant did not present any evidence to the trial court regarding
the two “tape recordings.” Thus, the record does not indicate precisely what type of
“tape recordings” are at issue.
          The search warrant commanded the officers to search for and seize several
items, consisting mainly of gambling paraphernalia and various types of records of
gambling information. Although “tape recordings” were not specifically listed in the
search warrant, the search warrant specifically commanded the officers to search for
and seize “instruments and instrumentality’s [sic] utilized in the offense of
communicating gambling information and computer and computer associated devices,
including but not limited to, magnetic tapes.”
          A search warrant may be sufficient with only a generic description of items to
be seized if a more specific description of the items is unavailable. Id. Here,
appellant has not demonstrated that the search warrant did not, in fact, adequately
describe the items to be seized, i.e., “as near as may be.”
          We overrule point of error 10.Restitution
          In point of error one, appellant contends that the trial court erred in ordering
him to pay $4,000 in restitution to the Houston Police Department as reimbursement
for its cost in the investigation and prosecution of appellant.



          After the denial of his motions to suppress evidence, appellant pleaded guilty
to the Class A misdemeanor offense of keeping a gambling place. The trial court
found appellant guilty and, pursuant to an agreed recommendation by the State,
assessed punishment at 30 days in jail. However, the trial court then, upon the motion
of the State and over appellant’s objection, ordered appellant to pay $4,000 in
restitution to the Houston Police Department as reimbursement for its expenses in
investigating and prosecuting appellant.
          We review challenges to restitution orders under an abuse of discretion
standard. Cartwright v. State, 605 S.W.2d 287, 288-89 (Tex. Crim. App. 1980). The
punishment for a Class A misdemeanor “shall be” a fine not to exceed $4,000,
confinement in jail for a term not to exceed one year, or both such fine and
confinement. Tex. Pen. Code Ann. § 12.21 (Vernon 1994). In addition to any fine
authorized by law, the court that sentences a defendant convicted of an offense may
order the defendant to make restitution to any “victim of the offense.” Tex. Code
Crim. Proc. Ann. art. 42.037(a) (Vernon Supp. 2003).
          The State argues, generally, that society would be served by the appellant
reimbursing the Houston Police Department for its expenses in concluding the
“inordinately complex and difficult investigation of the appellant’s offense.” Without
citing any authority, the State concludes that it was reasonable for the trial court to
find that the Houston Police Department was a “victim” under article 42.037.
          Although article 42.037 does not define the term “victim,” the Court of
Criminal Appeals has noted that, “the focus of restitution orders are limited to
individuals alleged and proven to be the victims of the charged offense.” Cabla v.
State, 6 S.W.3d 543, 546 (Tex. Crim. App. 1999). Moreover, restitution, as
contemplated by article 42.037, may be ordered if the offense results in damage to,
or loss or destruction of, property of a victim, bodily injury to a victim, or the death
of a victim. Tex. Code Crim. Proc. Ann. art. 42.037(b) (Vernon Supp. 2003).
          Here, the expenses incurred by the Houston Police Department in its
investigation of appellant were not sustained as the result of being the victim of a
crime. The Houston Police Department was not the direct recipient of an injury
caused by appellant’s crime. Thus, we hold the trial court abused its discretion in
ordering appellant to pay $4,000 restitution to the Houston Police Department.          We sustain point of error one.Conclusion
          We reverse and vacate the portion of the trial court’s judgment awarding
$4,000 restitution to the Houston Police Department, and we affirm the remainder of
the judgment.
 
 
                                                                        Terry Jennings
                                                                        Justice

Panel consists of Justices Hedges, Jennings, and Wilson.


 
Publish. Tex. R. App. P. 47.2(b).