OSCN Found Document:THOMAS v. CASH

 
 
 

 
 
 
 
 
 
 
 

 


 
 
 
 
 
 


 
 OSCN navigation


 
 
 Home

 
 Courts

 
 
 Court Dockets
 

 
 Legal Research

 
 Calendar

 
 Help
 
 





 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 
 
 

 
 
 
 THOMAS v. CASH
2017 OK CIV APP 11
Case Number: 113642
Decided: 08/25/2016
Mandate Issued: 02/23/2017
DIVISION II
THE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION II
Cite as: 2017 OK CIV APP 11, __ P.3d __

 

DAMIAN CHARLES THOMAS and SHELENA MARIE THOMAS, individually and on behalf of W. T., their minor child, Plaintiffs/Appellees,
v.
TERRI CASH, TINA CASH, and DORTHY LEE CHILDERS, Defendants/Appellants.



APPEAL FROM THE DISTRICT COURT OF
JOHNSTON COUNTY, OKLAHOMA

HONORABLE WALLACE COPPEDGE, TRIAL JUDGE



REVERSED AND REMANDED WITH INSTRUCTIONS



Jeremy S. Elliot, JEREMY S. ELLIOTT, P.C., Durant, Oklahoma, for Defendants/Appellants




THOMAS THORNBRUGH, PRESIDING JUDGE:


¶1 Defendants/Appellants, Terri Cash, Tina Cash, and Dorthy Childers,[1] appeal from the trial court's denial of their motions to vacate or for new trial following the entry of a protective order, in a consolidated proceeding, that, inter alia, prohibited Defendants from contacting Plaintiffs or posting photographs of, or making comments about, Plaintiffs on their social media websites. Plaintiffs did not respond to Defendants' petition in error, and they have not filed an answer brief. After review, we find a lack of evidence in the record on essential issues to support the trial court's decision. We reverse and remand with instructions to grant Defendants' motions to vacate.

BACKGROUND

¶2 Adult Plaintiffs Damian and Shelena Thomas are the adoptive parents of minor child W.T. (Child), whom they adopted in what they characterize as a "closed adoption" that was finalized in August 2006. Defendant Terri Cash is Child's birth mother, and it is not disputed that she relinquished her parental rights in January 2006, when Child was two years old.[2] It also is not disputed that Plaintiff Damian Thomas is Child's biological uncle; he is the brother of Child's birth father, who is not a party to this case. Defendant Tina Cash is Terri Cash's sister/Child's biological aunt; and Defendant Dorthy Childers is Terri Cash's mother/Child's biological grandmother.

¶3 On September 26, 2014, Plaintiffs, on behalf of Child and themselves individually, filed petitions seeking protective orders against each Defendant, making substantially the same allegations against each. Plaintiffs alleged that, even though Child knows she is adopted, she does not know the identity of her biological parents, nor have Plaintiffs revealed that information to anyone else.

Plaintiffs accused Defendants of "stalking" based on allegations substantially as follows:

-- Terri Cash and Dorthy Childers each sent Shelena Thomas "friend" requests on Facebook on or about September 17, 2014.

-- Shelena Thomas learned from her college-age daughter that Terri Cash had posted a picture of Child on Terri Cash's "Facebook" page, calling Child "mini-me" and her "baby girl." When Shelena Thomas "look[ed] around" Defendants' Facebook pages, she discovered Defendants had each posted pictures of Child that they had copied from Shelena Thomas's Facebook page "without my permission & saying how they miss their beautiful daughter/niece." Plaintiffs also alleged Defendants had posted one photo, taken several years in the past, of Child as she sat in the back seat of Plaintiffs' car at a Walmart parking lot.

-- Defendants refused Shelena Thomas's request via a Facebook message to remove Child's pictures. Tina Cash replied that Defendants were Child's "family" and that "as soon as [Child] finds out the truth about [Plaintiffs] taking her away from them that she would hate us." Terri Cash commented that Plaintiffs "could kiss her white butt." Dorthy Childers and Terri Cash each made Child's picture their Facebook "profile picture," so that when either of them "makes a post," Child's picture appears. Dorthy Childers also posted a Facebook comment agreeing with another friend's Facebook comment that Dorthy "would see [Child] again someday," and commented, "Yep, as soon as she turns 16," to which Terri Cash responded with the comment, "wrong it's 11."

-- Plaintiffs claimed that Child is "not mature or mentally stable enough" to know the identity of her birth parents, and accused Defendants' family of being "combative" in the past. They attached printed copies purporting to be from Defendants' Facebook pages showing various photos of Child. Defendants at trial confirmed the photos were copied from Plaintiffs' Facebook pages, which Plaintiffs admitted were not "restricted" at that time. Defendants' pages contain comments of a similar nature as described above concerning Child and Defendants' hopes to see her, as well as innuendo that Plaintiffs have been unfair to Terri Cash.

¶4 In November 2014, by agreement of the parties, the three petitions were considered collectively in a single trial, effectively consolidating the actions. The adult Plaintiffs appeared pro se; Child did not appear.

¶5 Damian Thomas testified that he sought out Defendants' Facebook pages after he received information that Child's pictures were posted, and saw pictures of Child along with comments as described in Plaintiffs' petitions. The photos included some of Child running track, in church, and in his car, including one taken several years earlier of Child sitting in the car in a store parking lot. He said Defendants did not have his permission to place Child's photos on their pages; however, he admitted that almost all of the photos on Defendants' pages appeared to have been copied from his own or Shelena Thomas's unrestricted Facebook pages, and that "anyone could go and look at" the pictures on his page. He admitted he had never been contacted by any Defendant, and he became aware of the photos only after he "was notified" that the pictures were on Defendants' pages. He also said he did not "as a father live in fear" for Child, and that he allowed other people to take and post pictures of Child on Facebook because he wanted to "give her a normal life" and did not "want to try to shelter" Child.[3]

¶6 Shelena Thomas also testified that she had "never had a problem" with Child's pictures being seen on Facebook generally, but that her "problem is the contact [by Defendants] and also the violation of our privacy." She testified that because "this was a closed adoption," Defendants had no right "to disclose (a) that [Child] is adopted or (b) that they are the maternal lineage whatsoever." She did not know, however, whether a court order had been entered within the adoption proceeding that prohibited Terri Cash or other biological family members from having contact with Child.[4] She also admitted that she did not feel "threatened" by a message from Tina Cash arguing that Child should be allowed to visit her biological family. She stated that the only contact she had had with Dorthy Childers was by going to Childers' Facebook page and seeing pictures of Child; and that she had received only one Facebook message from Terri Cash, in which Terri asked about "how [Child] was doing, something along those lines." Shelena Thomas denied feeling threatened by any of the messages, "other than not supposed to be having contact with us with a closed adoption or not family members."

¶7 Each Defendant testified. Each denied malicious intent, denied intentional direct physical contact with Child, and denied allowing Plaintiffs to access their Facebook pages. They also admitted they obtained most of Child's pictures from Shelena Thomas's unrestricted Facebook page, and that they made comments on their own Facebook pages about Child and Child's pictures. They denied directing any comments to Plaintiffs, although each Defendant admitted sending at least one message to Shelena Thomas asking about Child's welfare and/or asking to be allowed to see Child. Terri Cash and Tina Cash also admitted to having taken Child's photo five or six years earlier in a Walmart parking lot.

¶8 Terri Cash stated that she believed Child's biological father was permitted to see and visit with Child, and although Plaintiffs objected to the testimony, they did not deny it. In addition, although she stipulated that Child was legally adopted by the adult Plaintiffs, Terri Cash said the adoption included provisions allowing her to have continued contact with Child. She said she had not attempted to contact Child previously because she did not want to confuse her, but denied that her current Facebook postings were intended to harm Child or the adult Plaintiffs. Each Defendant's testimony indicates that they want to publicly recognize Child as their biological kin.

¶9 As noted above, Child did not testify, and was not present for the proceedings. It is undisputed that none of the Defendants had sent messages via social media directly to Child.

¶10 At the close of the evidence, the trial court entered a protective order, effective for a period of five years (until November 18, 2019) against each Defendant on grounds of harassment. The trial judge made verbal findings that he saw "no valid purpose" for Defendants to "post [Child's] photos on social media other than for the purpose of harassment," that "all three Defendants are harassing by doing that as to the Plaintiff parents," and that Defendants' conduct "seriously alarms the Petitioners and it serves no legitimate purposes." The court also entered a standardized "Order of Protection" against each Defendant, finding that each Defendant "represents a credible threat to the physical safety of an intimate partner or child," and prohibiting Defendants from "attempting or having any contact" with Plaintiffs, including Child, by any means. Each order also contained a checkmark next to standardized language stating:



There is an existing visitation order, and in order to protect from threats of abuse or physical violence by the Defendant or a threat to violate a custody order, the Court suspends or modifies child visitation as follows:

. . .

[The following language is written by hand]

d. The Defendant is not to post or display any photograph of the minor child or the child's parents, Charles Damian Thomas or Shelena Thomas or make any comments about any of them on any social media or to the petitioners or to any public site.[5]



Defendants filed motions to reconsider or for new trial, which the trial court denied. Defendants filed this appeal.

STANDARD OF REVIEW

¶11 Defendants' post-trial motions were filed within 10 days of the trial court's final protective order. As such, this Court may treat them as a motion to vacate or a timely motion for new trial. See McMillian v. Holcomb, 1995 OK 117, n.3, 907 P.2d 1034.[6] A trial court's denial of a motion to vacate or for new trial is reviewed for abuse of discretion; and where, as here, the new trial motion was filed so as to extend the time for appeal, "on its denial, the movant can secure full review of the adverse judgment and of all proceedings that led to it, if error was properly preserved." Schepp v. Hess, 1989 OK 28, n.2, 770 P.2d 34.

¶12 The entry of a protection order also is reviewed for abuse of discretion:



A protection order under the Protection from Domestic Abuse Act, 22 O.S.Supp.2006, §§ 60-60.18, is analogous to an injunction. Because the grant or denial of an injunction is reviewed for an abuse of discretion, Johnson v. Ward, 1975 OK 129, ¶ 42, 541 P.2d 182, 188, we find that proceedings under the Act also should be reviewed for an abuse of discretion. Under an abuse of discretion standard, the appellate court examines the evidence in the record and reverses only if the trial court's decision is clearly against the evidence or is contrary to a governing principle of law. State ex rel. Tal v. Oklahoma City, 2002 OK 97, ¶ 3, 61 P.3d 234, 240. To reverse under an abuse of discretion standard, an appellate court must find the trial court's conclusions and judgment were clearly erroneous, against reason and evidence. Oklahoma Tpk. Auth. v. Little, 1993 OK 116, ¶ 6, 860 P.2d 226, 228.



Curry v. Streater, 2009 OK 5, ¶ 8, 213 P.3d 550. However, if review of the trial court's judgment raises an issue of law it is reviewable "under a de novo standard." Cherokee Nation v. Nomura, 2007 OK 40, ¶ 11, 160 P.3d 967.

ANALYSIS

¶13 Oklahoma's Protection from Domestic Abuse Act, 22 O.S.2011 & Supp. 2014 §§ 60 through 60.20, authorizes an order of protection on proof of domestic abuse, stalking, or harassment. "Harassment" is defined at § 60.1(3) as follows:

3. "Harassment" means a knowing and willful course or pattern of conduct by a family or household member or an individual who is or has been involved in a dating relationship with the person, directed at a specific person which seriously alarms or annoys the person, and which serves no legitimate purpose. The course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial distress to the person. "Harassment" shall include, but not be limited to, harassing or obscene telephone calls in violation of Section 1172 of Title 21 of the Oklahoma Statutes and fear of death or bodily injury[.][7]

¶14 In Curry, the Court explained that the "clear purpose" of the Act is "preventative," with its primary goal being to "prevent violence before it happens." Id. ¶ 10. The Court also cautioned, however, that a protective order should not be issued lightly, "on the theory that it will do no harm or cause the defendant no real inconvenience." Id. ¶ 11. "[T]he unwarranted issuance of a protective order can have unjustified, irreversible consequences for a defendant," including, among other things, potentially affecting a defendant's career or restricting the exercise of constitutional rights. Id. 

¶15 Here, Defendants contend that the record does not support the determination that they engaged in "harassment" as defined by statute. Among other things, they point to the lack of evidence that any Defendant caused any Plaintiff to actually suffer substantial emotional distress or to feel threatened by Defendants' conduct. Defendants note the adult Plaintiffs have posted unrestricted pictures of Child with comments, and that other individuals have posted pictures of Child without objection by Plaintiffs. Defendants argue that their postings of Child's picture and comments were not of a type to constitute harassment, in that they were not malicious, or intended as threats, and did not cause Plaintiffs substantial emotional distress.

¶16 Citing Holeman v. White, 2012 OK CIV APP 107, 292 P.3d 65, Defendants further argue that their conduct involves postings on electronic media; that Defendants did not initiate any of the alleged contacts about which Plaintiffs complain; and that the adult Plaintiffs had to actively seek out Defendants' Facebook pages - apparently through third parties who were Facebook "friends" of Defendants - in order to even see the photos and comments allegedly causing the "harassment." In Holeman, the Court held the evidence insufficient to support an ex-husband's petition for a protective order against his ex-wife's current husband, where the case was based upon insulting and abusive emails sent from the current husband to the ex-husband in response to emails sent by the ex-husband to the ex-wife. The Court noted the evidence showed that the petitioner was "annoyed" by the emails, but there was no threat of violence within them or evidence that the petitioner feared bodily injury or had suffered emotional distress. The Court found the trial court abused its discretion when it "made the leap from 'annoyed' to issuing the VPO," Id. ¶ 13, and specifically noted that the petitioner's apparent "inability to turn off the computer or delete the emails" was not reason enough to issue a protective order when an essential element of the definition of "harassment" is lacking, id. ¶ 15.

¶17 As noted above, Plaintiffs have neither appeared nor filed an answer brief in this appeal. "Where there is an unexcused failure to file an answer brief, this Court is under no duty to search the record for some theory to sustain the trial court judgment; and where the brief in chief is reasonably supportive of the allegations of error, this Court will ordinarily reverse the appealed judgment with appropriate directions." Cooper v. Cooper, 1980 OK 128, ¶ 6, 616 P.2d 1154. However, "[r]eversal is never automatic on a party's failure to file an answer brief." Enochs v. Martin Props., Inc., 1997 OK 132, ¶ 6, 954 P.2d 124 (footnote omitted). If the record does not support the error alleged in the appellant's brief, the lower court's decision will not be disturbed, as the decision "is presumed correct until the contrary is shown by the record." Id.

¶18 Here, we find the record supports the error alleged in Defendants' appellate brief, and that under the circumstances presented the trial court abused its discretion in entering orders of protection against Defendants. As was the case in Holeman, while the evidence in this case shows that Child's adoptive parents may be "annoyed" by Defendants' conduct, the only basis for that annoyance, per their own testimony, is their feeling that Defendant Terri Cash "invaded their privacy" and had "no right" to post Child's pictures or attempt to contact them about Child because of the "closed adoption." Neither of the adult Plaintiffs claimed to be fearful or to have experienced threats of physical harm or substantial emotional upset. In fact, the adult Plaintiffs denied feeling threatened or fearful as parents of Child. Child did not testify, but there was no evidence that she is aware of Defendants' conduct or the Facebook postings. In this regard, see Horowitz v. Horowitz, 160 So.3d 530, 532 (Fla. Ct. App. 2015), where the Court found insufficient evidence of substantial emotional distress where the claim of same was based primarily on the plaintiff's testimony that the defendant's Facebook posts "concerned" her and "prevented [her] from having any privacy in her own home."

¶19 To the extent there may have been a privacy "invasion," the record suggests that Plaintiffs likely brought that condition on themselves, by virtue of the pictures they have posted of Child to their own Facebook accounts and allowing others to post pictures of Child in the same manner.[8] Further, although Plaintiff Shelena Thomas characterized Child's adoption as "closed," Plaintiffs presented no order from the adoption proceedings. Terri Cash testified to her understanding that post-adoption contact was permitted, and the trial court - though possibly through inadvertence or error in using a standardized provision relating to visitation - found that a visitation order is in place.[9]

¶20 Finally, we note that Plaintiff Shelena Thomas's testimony indicated she is concerned for Child's future emotional well-being. Again, however, there was no evidence that Child is aware of Defendants' postings, or that Defendants have attempted to contact Child directly over the adoptive parents' objection. This case is not like the situation presented in Muscato ex rel. Butler v. Moore, 2014 OK CIV APP 93, 338 P.3d 643, where the Court affirmed a protective order based on stalking, sought by a mother on behalf of her 14-year-old daughter, against the mother of the daughter's former friend. Although the daughter testified she did not feel threatened or harassed by the defendant, the minor's mother had instructed the defendant to discontinue contact with her child, and it was undisputed that the defendant sent text messages, sought the minor out at church, and attempted other direct contact with the girl after being instructed by the parent not to do so.

¶21 Here, given the lack of any evidence that Defendants have in fact posed a threat of harm or caused any Plaintiff to suffer substantial emotional distress, we find the trial court abused its discretion in entering protective orders against Defendants for harassment based almost entirely on their Facebook postings of Child's pictures obtained from Child's adoptive parents' Facebook pages, and comments to other Facebook "friends" about Child. Accordingly, we reverse the decision and remand with instructions to grant Defendants' motions to vacate the orders.

¶22 By this decision, however, we do not intend to suggest that no set of facts involving Defendants' social media posts will warrant a protective order against one or all of them for stalking or harassment; nor do we suggest that Defendants may now attempt to contact Child or continue to post pictures and comments concerning Child and Plaintiffs with impunity. Nor do we address Defendants' other allegations of error concerning the lower court's decision. We hold only that Plaintiffs failed to demonstrate they suffered the emotional distress required to support issuance of protective orders under the relevant statutory provision and the circumstances presented.

CONCLUSION

¶23 The record lacks evidence to support the trial court's entry of protective orders against Defendants based on harassment. Plaintiffs have failed to appear or file an answer brief, and Defendants' brief is supportive of the errors alleged in support of reversal. The trial court abused its discretion in entering the orders. Its decision is reversed, and this matter is remanded with instructions to grant Defendants' motions to vacate.


¶24 REVERSED AND REMANDED WITH INSTRUCTIONS.



RAPP, J., and BARNES, J., concur.



FOOTNOTES


[1] We use the versions and spellings of Defendants' names as they appear on their petition in error and appellate brief.



[2] At the time of the proceedings in the trial court, Child, who did not testify, was approximately 10 years old.



[3] He answered a line of questioning on re-direct examination by his wife as follows:

Q Do you as a father live in fear for any reason? Do you keep [Child] in hiding or do you allow her to live a normal life of a child?
A No, I try to give her a normal life. I don't want to try to shelter her.
Q So you don't restrict other family members or other parents that are at school activities or public activities? You don't tell them that they cannot take pictures of your child and they cannot post them on social media?
A No.
Q Why is that?

A Because it's singling her out.
Q Do you care who sees her photos on Facebook?
A No.
Q Do any of these people or family members claim to be the parents or have any sort of relationship that's not legally binding on Facebook?
A No.
Q So there is no problem with your daughter's pictures being on Facebook?
A No.
Q There's no fear of her identity being exposed to anybody, correct?
A No.
Q So you live a normal life and your daughter knows she's adopted?
A Yes.



[4] She testified that "with DHS adoptions I was told that it's inferred that they are closed adoptions."



[5] Other standardized language checked by the trial court required Defendants to "immediately surrender all firearms and other dangerous weapons within the Defendant's possession or control and any concealed carry license," and to pay court costs.



[6] Stating: "A 'motion to reconsider' does not exist in the nomenclature of Oklahoma's statutory pleading scheme. A 'motion to reconsider' may be judicially considered as a 12 O.S. § 651 motion for new trial or a term-time motion to vacate pursuant to 12 O.S. § 1031.1," and citing Schepp v. Hess, 1989 OK 28, 770 P.2d 34; Pierson v. Canupp, 1988 OK 47, 754 P.2d 548; and Huff v. Huff, 1984 OK 51, 687 P.2d 130.



[7] Defendants have not challenged, in the trial court or on appeal, the Act's applicability to them as members of Child's birth family. Pursuant to 22 O.S. § 60.1(4), "Family or household members" means:

a. spouses,
b. ex-spouses,
c. present spouses of ex-spouses,
d. parents, including grandparents, stepparents, adoptive parents and foster parents,
e. children, including grandchildren, stepchildren, adopted children and foster children,
f. persons otherwise related by blood or marriage,
g. persons living in the same household or who formerly lived in the same household, and
h. persons who are the biological parents of the same child, regardless of their marital status, or whether they have lived together at any time. This shall include the elderly and handicapped[.]



[8] Whether a party may legitimately have an expectation of privacy in his or her Facebook postings or other communications is a developing area of the law. In this regard, see, e.g., Chaney v. Fayette County Pub. Sch. Dist., 977 F.Supp.2d 1308 (N.D. Ga. 2013)(holding that minor student had no reasonable expectation of privacy in photographs she posted on her Facebook page, even though restricted to allow access only by "friends" and "friends of friends"); and U.S. v. Meregildo, 883 F.Supp.2d 523 (S.D.N.Y. 2012)(holding that a defendant in a criminal racketeering case surrendered his expectation of privacy when he disseminated photos and other content to his Facebook site, even though privacy settings allowed viewership only by "friends"). "The Supreme Court consistently has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." Rehberg v. Paulk, 611 F.3d 828, 842 (11th Cir. 2010)(quoting Smith v. Maryland, 442 U.S. 735, 743-44, 99 S.Ct. 2577, 2582 (1979)).



[9] We note that Oklahoma statutes do not contain a wholesale prohibition on post-adoption contact between birth relatives and adopted children, and Department of Human Services regulations specifically provide for the possibility of post-adoption contact agreements. See, e.g., 10A O.S.2011 § 1-4-813; and Okla. Admin. Code § 340:75-15-103.









 Citationizer© Summary of Documents Citing This Document
 
 
 Cite
 Name
 Level
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 Cite
 Name
 Level
 
 
 Oklahoma Court of Civil Appeals Cases
 Cite
Name
Level

 2012 OK CIV APP 107, 292 P.3d 65, HOLEMAN v. WHITE
Discussed
 2014 OK CIV APP 93, 338 P.3d 643, MUSCATO v. MOORE
Discussed
Oklahoma Supreme Court Cases
 Cite
Name
Level

 1988 OK 47, 754 P.2d 548, 59 OBJ 1228, Pierson v. Canupp
Discussed
 1989 OK 28, 770 P.2d 34, 60 OBJ 540, Schepp v. Hess
Discussed at Length
 1993 OK 116, 860 P.2d 226, 64 OBJ 2879, Oklahoma Turnpike Authority v. Little
Discussed
 1995 OK 117, 907 P.2d 1034, 66 OBJ 3471, McMillian v. Holcomb
Discussed
 2002 OK 97, 61 P.3d 234, STATE ex rel. TAL v. CITY OF OKLAHOMA CITY
Discussed
 2007 OK 40, 160 P.3d 967, CHEROKEE NATION v. NOMURA
Discussed
 2009 OK 5, 213 P.3d 550, CURRY v. STREATER
Discussed
 1975 OK 129, 541 P.2d 182, JOHNSON v. WARD
Discussed
 1980 OK 128, 616 P.2d 1154, Cooper v. Cooper
Discussed
 1997 OK 132, 954 P.2d 124, 68 OBJ 3523, ENOCHS v. MARTIN PROPERTIES, INC
Discussed
 1984 OK 51, 687 P.2d 130, Huff v. Huff
Discussed
Title 12. Civil Procedure
 Cite
Name
Level

 12 O.S. 651, New Trial - Definition - Causes for
Cited
 12 O.S. 1031.1, Authorization to Correct, Open, Modify or Vacate Judgments - Time - Notice - Costs
Cited
Title 22. Criminal Procedure
 Cite
Name
Level

 22 O.S. 60, Short Title
Cited
 22 O.S. 60.1, Definitions
Cited