CONCURRENCE
BOGGS, Circuit Judge,
concurring.
I
I write separately to highlight certain additional factors at play in this case that provide additional comfort that our holding today is correct.
At oral argument, the government conceded that if the GPS tracking had been *1019 precise enough to identify a specific home or motel room in which Riley was hiding— rather than a motel generally—Kyllo and Karo may have presented greater concerns:
I think that, if these coordinates had been sufficient to identify a home or a hotel room, this could be a different case, but I think the fact here that the coordinates only get the police officers to the hotel lobby, essentially, and they then have to do additional work in terms of figuring out exactly what hotel room he’s in, makes this case different from if he had been identified in his home, and makes this case more akin to Skinner.
Tr. of Oral Arg. 20:06-20:35.
But our precedent in Skinner governs because the tracking here brought the law-enforcement officers only as far as the lobby of the Airport Inn—a public area— and the officers then had to ask the front-desk clerk to determine Riley’s whereabouts within the confines of a specific hotel room.
I would note that in cases like Riley’s, even tracking GPS data within a home or a hotel room may fail to rise to the level of a Fourth Amendment search when the individual, whose cell-phone location is tracked is a fugitive subject to a valid arrest warrant, and when the law-enforcement officers tracking him have at least reasonable suspicion that he is in possession of the phone being tracked. Thus, for the reasons that follow, I would hold that Riley’s Fourth Amendment claim fails, alternatively, because he was a fugitive subject to a valid arrest warrant, and because the officers here had reasonable suspicion that he was in possession of the phone that they were tracking.
A. The Third-Party Doctrine
Supplementing the general Fourth Amendment unreasonable-search framework based on the Supreme Court’s rulings in Katz and Jones is the so-called third-party doctrine, according to which one can have no reasonable expectation of privacy in information knowingly disclosed to a third party, and thus no Fourth Amendment claim can lie for the acquisition and use by law-enforcement agents of such information. See United States v. Miller, 425 U.S. 435, 441-43, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976) (holding government-compelled disclosure of “a depositor’s private [bank] records” was not a Fourth Amendment search because “the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed”); Smith v. Maryland, 442 U.S. 735, 742, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979) (holding government-compelled installation of a pen register to track phone numbers dialed from a specified telephone-service subscriber’s landline phone was not a search where the pen register was installed on the telephone company’s property and where the outbound phone numbers were voluntarily disclosed to the telephone company and therefore could not reasonably be considered private).
But Kyllo, decided well after both Miller and Smith, expressly rejected the notion that the government’s use of thermal-imaging devices to detect heat within the defendant’s home could be justified on the ground that the defendant “exposed” his activity “to the public” by emitting heat waves that could be detected from a public vantage point. Kyllo, 533 U.S. at 44, 121 S.Ct. 2038 (Stevens, J., dissenting) (drawing analogies between heat waves that “enter the public domain if and when they *1020 leave a building” and discarded garbage, California v. Greenwood, 486 U.S. 35, 45, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988), pen-register data, Smith, 442 U.S. at 742, 99 S.Ct. 2577, and subpoenaed utility records). In short, the third-party doctrine does not lay bare to Big Brother’s watchful eye every activity conducted within the home just because someone outside the home might be able to detect its occurrence. The third-party doctrine, therefore, would likely be insufficient on its own to support government-compelled tracking of location data that revealed movements within a home or hotel room.
•B. The Fugitive-Suspect Distinction
A key distinction between this case and Kyllo, Karo, Knotts, and Skinner, which further supports our holding, is that the government tracked Riley’s cell phone only after a valid warrant for his arrest had already been issued, whereas the defendants in Kyllo, Karo, Knotts, and Skinner were criminal suspects but not fugitives. And although the text of the Fourth Amendment does not itself imply that individuals on the run from arrest warrants have a diminished expectation of privacy, the Supreme Court’s decision in Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), as corroborated by significant historical evidence of the original meaning of the Fourth Amendment, provides strong support for the proposition that they do. Id. at-592-96, 603, 100 S.Ct. 1371 (holding that where law-enforcement officers have a valid arrest warrant and reasonably suspect that the individual subject to arrest is inside his home, they may enter the home and arrest the individual without first obtaining a search warrant to do so).
The logic in Payton is that the Fourth Amendment requires the government to obtain a warrant before entering the ar-restee’s home, but whether the warrant must be an arrest warrant or a search warrant is not a question answered definitively by the constitutional text, and in the case of a fugitive subject to a valid arrest warrant, the arrest warrant “will suffice to interpose the magistrate’s determination of probable cause between the zealous officer and the citizen.” Id. at 602-03, 100 S.Ct. 1371 (“If there is sufficient evidence of a citizen’s participation in a felony to persuade a judicial officer that his arrest is' justified, it is constitutionally reasonable to require him to open his doors to the officers of the law.”).
Surely, if the issuance of a valid arrest warrant may reasonably require an individual to open the doors of his home, which stands at the “very core” of Fourth Amendment protection, Silverman, 365 U.S. at 511, 81 S.Ct. 679, then it may reasonably require the same individual to open the doors of his phone—at least so far as to disclose the longitude and latitude coordinates emitted by a phone that the individual chooses to carry and turn on. Allowing law-enforcement agents to track a fugitive’s cell-phone location data, including GPS location data within the home, thus falls well within the logic of Payton without contravening Kyllo or Karo: so long as a valid arrest warrant has been issued, law-enforcement officers who reasonably suspect that a cell phone is in the possession of the subject of the warrant may track that cell phone’s location in order to facilitate the execution of the warrant, without implicating the Fourth Amendment.
C. Factors Weighing Against the Fugitive’s Expectation of Privacy in GPS Location Data
Several considerations, none of which is independently sufficient, support the proposition that a cell-phone service provider’s *1021 records of a fugitive’s cell-phone location data are not private for Fourth Amendment purposes.
First, the subject of the surveillance is a fugitive. While a fugitive does not forfeit all his expectation of privacy—after all, under Payton, law-enforcement officers may not simply break into a fugitive’s home to arrest him without at least some reason to believe that the fugitive is inside—the most compelling factor in favor of allowing the government to track a fugitive’s cell phone regardless of the phone’s location is that the fugitive is the subject of a valid arrest warrant.
In addition to the rule in Payton, which allows officers to enter an arrestee’s home to effectuate the arrest with only reasonable suspicion that the arrestee is at home, the Supreme Court has held that law-enforcement officers in “hot pursuit” of their quarry have a limited right to enter private homes without a search warrant. See Warden v. Hayden, 387 U.S. 294, 298, 310, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) (holding exigent circumstances validated warrantless entry into a home to search for a suspected armed robber who had reportedly entered less than five minutes earlier). There is some historical support for holding that a fugitive’s expectation of privacy at home is diminished as well: at common law, officers may have had at least some authority enter a home to execute an arrest warrant after first making a demand. See Payton, 445 U.S. at 616, 100 S.Ct. 1371 (citing Semayne’s Case, 5 Co. Rep. 91a, 77 Eng. Rep. 194 (K. B.) (1603)) (“[I]n cases of felony, the officers were required to announce their presence, demand admission, and be refused entry before they were entitled to break doors.”); but see 3 William Blackstone, Commentaries *288 (“[F]or the most part not so much as a common citation or summons, much less an arrest, can be executed upon a man within his own walls.”). Arguably, one who refuses the lawful demand of the King to enter and execute an arrest warrant is in an analogous position to one who is on the run from a lawful arrest warrant, and so the two could reasonably be expected to have similar expectations of privacy.
Second, the information gathered in cases like Riley’s is location data, not call content. To be sure, Kyllo and Karo set a fairly low threshold level of intrusion within the home at which surveillance becomes a search. But tracking Riley’s cell-phone location provided no more information about the interior of Riley’s home (or motel room) than did the tracking device in Karo, and it provided far less information than did the thermal-imaging device in Kyllo. While GPS tracking is “accurate within about 50 feet,” United States v. Carpenter, 819 F.3d 880, 889 (6th Cir. 2016), and is thus more precise than CSL data, which ballparks a cell phone’s location within a “radial wedge extending between one-half mile and two miles in length” based on the cell towers to which it connects, ibid., GPS coordinates reveal nothing other than the location of the phone: no call content, no text-message or email content, and no application data.
Third, the tracking in cases like Riley’s is limited in duration and reach. In Jones, Justices Sotomayor and Alito wrote separate concurring opinions in which they commented that “the use of longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy.” Jones, 565 U.S. at 430, 132 S.Ct. 945 (Alito, J., concurring in the judgment); id. at 412, 132 S.Ct. 945 (Sotomayor, J., concurring) (quoting id. at 430, 132 S.Ct. 945). Justice Alito’s comment, however, pertains to investigations, not manhunts. And for fugitives subject to an arrest warrant, the duration of surveillance, which will ordinarily be relatively short-term (i.e., com *1022 mencing after the issuance of an arrest warrant and ending when the fugitive is found), is less of a concern than for those who are simply suspects of an investigation.
Fourth, although I noted that the third-party doctrine itself does not provide a basis for using technology to detect activity within a home, the fact that cell-phone users voluntarily disclose their location data by keeping their phones turned on weighs against finding their location data to be private. It is, of course, unclear whether Riley knowingly disclosed his location data (the record does not indicate whether Riley was aware of the cell phone’s GPS feature, nor does it include any terms of Riley’s cell-phone service contract that would reveal whether Riley agreed to allow AT&T either to gather and store his GPS location data or to initiate signals to Riley’s phone to facilitate real-time tracking, if AT&T in fact did that). But the fact that Riley chose to carry a cell phone (as distinguished from the tracking devices carried unwittingly by the defendants in Karo and Knotts) certainly weighs in favor of allowing the government to access AT&T’s records of Riley’s cellphone location in order to arrest him, even if those records were generated only in response to requests from the government for real-time location tracking. A criminal hiding from an arrest warrant “can hardly complain,” Slcinner, 690 F.3d at 774, about the burden of having to evade detection without constant use of a cell phone.
To say otherwise would be to require the government to avert its eyes from GPS location data that are freely available to the wireless providers that facilitate fugitives’ use of cell phones, but the Fourth Amendment does not require such willful blindness. Cf. Ex parte Jackson, 96 U.S. 727, 737, 24 L.Ed. 877 (1877) (holding that the content of letters and sealed packages deposited in the mail could be examined only upon the issuance of a warrant, but the content of printed matter “left open for examination,” such as newspapers, and, by implication, the mailing information on the outside of a sealed letter, was not protected by the Fourth Amendment).
The logic in Jackson, in which a defendant was convicted of depositing “a circular concerning a lottery offering prizes” into the United States mail in violation of a federal statute, id. at 727-28, is that one using the mail—no matter how essential to daily life the mail might have been in 1877—assumes the risk that the government will see, and will have no duty to avert its eyes from, information left open to be seen. Under the logic of Jackson, one who voluntarily but unknowingly left a letter unsealed and then mailed it would have no recourse in the event that a government official found evidence of a crime in the letter and used it to secure a warrant. Perhaps the current state of cell-phone location data is similar: as a general matter, cell-phone users may not have any idea of the extent to which their cell phones are broadcasting their location (whether in the form of CSL data or GPS location data). But in choosing to carry and turn on and leave on cell phones equipped with GPS and other location-based services, people arguably assume the risk that their cell-phone service providers may disclose to the government the location data they acquire—at least in the absence of a contractual agreement between the consumer and the service provider that would prohibit or restrict such disclosure. And while the strong Fourth Amendment protections afforded to the home may yet protect some cell-phone location data emitted from within the home from being tracked by the government, a fugitive who carries a cell phone turned on must assume the risk that the government is able to track him wherever he may be.
*1023 Of course, law-enforcement officers could track down fugitives the old-fashioned way: they could put out alerts to be posted upon grocery-store bulletin boards for oblivious shoppers to disregard, and they could wait for the fugitives to be caught, perhaps, when they commit some other crime from which they are less successful in flight. But that cannot be what the Constitution requires; when fugitives use sophisticated cell phones to evade detection, whether by communicating electronically, finding hideouts, soliciting willing abettors, or perhaps acquiring false documents and the like, it only makes sense that law-enforcement agents be able to track fugitives’ cell-phone location data to execute valid arrest warrants.
Accordingly, even setting aside the fact that the government’s GPS location tracking here revealed only information about the public movements of Riley’s cell phone, Riley’s Fourth Amendment claim fails because Riley was a fugitive from justice who lacked a reasonable expectation of privacy in his whereabouts, and the district court was correct to deny Riley’s motion to suppress.
II
Unlike the traditional children’s game of hide-and-seek, which tolerates most means of finding those who are hiding, the Fourth Amendment separates cop from robber by the requirement that “a neutral and detached magistrate,” Johnson v. United States, 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948), issue a warrant based on probable cause that the robber has committed the robbery.
Once a valid warrant has issued, however, the game changes: the robber may not both seek refuge from execution of the warrant and simultaneously broadcast his location by carrying a GPS-enabled cell phone.
GPS data, unlike CSL data, can locate a tracked object to within tens of feet of its actual location. Still, as in this case, it may not be sufficiently precise to pinpoint the exact location of a GPS-enabled cell phone. To the extent that GPS tracking reveals location information that would otherwise be available from public vantage points, such as identifying Riley’s presence at the Airport Inn in this case, our precedent in Skinner permits at least short-term tracking of such location information. Even within the confines of a home or a hotel room, the Fourth Amendment does not shield a fugitive’s cell phone from being located while turned on: a cell-phone service provider’s records of the phone’s location are not private, and their use by law enforcement, compelled or otherwise, is not a search under the Fourth Amendment so long as the officers have at least reasonable suspicion that the phone they are tracking is in the possession of the fugitive they seek.
Finally, I would note that our opinion today does not—because it needs not— address many questions that will almost certainly arise in future geolocation cases, such as whether or when the government may use GPS location data to track individuals other than fugitives within the home. Nor does it address the questions that will surely arise as technology continues to develop. Perhaps, for example, if government agents gain the ability to activate and monitor the microphone, camera, or video recorder on an individual’s cell phone without the individual’s knowledge, the greater degree of intrusion from such audiovisual monitoring could materially affect even a fugitive’s expectation of privacy in the data transmitted from his cell phone. And nothing in our opinion curtails the power of federal and state legislatures to craft legislation against cell-phone location tracking if they wish. Indeed, our *1024 opinion today does not address whether existing protections under the Stored Communications Act or elsewhere may already impose additional requirements on government agents seeking to engage in the sort of GPS location tracking that the Marshals used here to track Riley, because the only question before us is whether the tracking violated Riley’s constitutional rights—and it did not.